Filed 11/21/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JANICE DICKINSON,<br>        Plaintiff and Appellant,<br><br>    v.<br><br>WILLIAM H. COSBY, JR.,<br>        Defendant and Appellant;<br><br>MARTIN D. SINGER,<br>        Defendant and Respondent. | B271470<br><br>(Los Angeles County<br>Super. Ct. No. BC580909) |

        APPEAL from orders of the Superior Court of Los Angeles County.  Debre Katz Weintraub, Judge.  Affirmed in part and reversed in part.
        Liner, Angela C. Agrusa; Greenberg Gross and Alan A. Greenberg for Defendant and Appellant William H. Cosby, Jr.
        The Bloom Firm, Lisa Bloom, Jivaka Candappa and Alan Goldstein for Plaintiff and Appellant Janice Dickinson.
        Horvitz & Levy, Jeremy B. Rosen and Felix Shafir; Lavely & Singer and Andrew B. Brettler for Defendant and Respondent Martin D. Singer.
        Buchalter and Harry W.R. Chamberlain II for Amicus Curiae on behalf of Association of Southern California Defense Counsel.
        California Anti-SLAPP Project and Mark A. Goldowitz for Amicus Curiae on behalf of California Anti-SLAPP Project.

_____

Plaintiff Janice Dickinson went public with her accusations of rape against William H. Cosby, Jr. Cosby, in turn, through his attorney, Martin Singer, reacted with (1) a letter demanding media outlets not repeat Dickinson's allegedly false accusation, under threat of litigation ("demand letter"); and (2) a press release characterizing Dickinson's rape accusation as a lie ("press release"). Dickinson brought suit against Cosby for defamation and related causes of action. Cosby responded with a motion to strike under Code of Civil Procedure section 425.16 (the "anti-SLAPP" statute).[1] When Cosby's submissions indicated that Singer might have issued the statements without first asking Cosby if the rape accusations were true, Dickinson filed a first amended complaint, adding Singer as a defendant. Cosby and Singer successfully moved to strike the first amended complaint because of the pending anti-SLAPP motion. The court then heard Cosby's anti-SLAPP motion, granting it as to the demand letter, and denying it as to the press release.

Dickinson appeals the order granting the motion to strike her first amended complaint; and the grant of the anti-SLAPP motion with respect to the demand letter. Cosby appeals the order denying his anti-SLAPP motion with respect to the press release. We conclude: (1) the court erred in striking Dickinson's first amended complaint, as it pertains only to a party, Singer, who had not filed an anti-SLAPP motion; (2) the court erred in

[1]     SLAPP is an acronym for Strategic Lawsuit Against Public Participation. (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 678, fn. 2.) The statute is designed to provide a quick and easy means by which a defendant can obtain dismissal of a meritless lawsuit "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (Code Civ. Proc., § 425.16, subd. (a).)

granting the anti-SLAPP motion with respect to the demand letter; and (3) the court correctly denied the anti-SLAPP motion with respect to the press release. Accordingly, we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Alleged Rape*

According to Dickinson, Cosby drugged and raped her in 1982. Dickinson was a successful model; Cosby was a famous comedian and television actor. They met for dinner, and Dickinson complained to Cosby of menstrual cramps. Cosby offered her a pill that he said would help; the pill was actually a narcotic which heavily sedated her. Later that night, he sexually assaulted her, committing vaginal and anal rape. Dickinson did not report the crime, due to fear of retaliation by Cosby, "a wealthy, powerful celebrity." The evidence would show, however, that she did tell some close friends.

2. *Dickinson's Autobiography*

In 2002, Dickinson's autobiography, *No Lifeguard on Duty*, was published by Regan Books, an imprint of HarperCollins. Dickinson's evidence in opposition to the anti-SLAPP motion shows the following: Dickinson disclosed the rape to her ghostwriter, Pablo Fenjves, and wanted it included in the book. The president of Regan Books, Judith Regan, discussed the matter with the legal department at HarperCollins, which said the rape could not be included without corroboration. Regan thought corroboration would be difficult, but believed Dickinson to be credible and argued to include the rape. As the HarperCollins legal department refused to publish the rape allegations, Fenjves wrote a "sanitized version of the encounter," in which Dickinson "rebuffed Cosby's sexual advances and

3

retreated to her room." The book stated that when Dickinson turned Cosby down, "he gave [her] the dirtiest, meanest look in the world, stepped into his suite, and slammed the door in [her] face." According to Regan, Cosby was "mentioned in the book to satisfy Ms. Dickinson in some way; however the story was modified to deal with the issue without any legal problems."

In September 2002, shortly after publication of the book, the *New York Observer* published an interview with Dickinson. The article begins with the interviewer discussing highlights from the book, including that Dickinson believed Cosby when he told her that she had a good singing voice, "that is, until she didn't want to go to bed with him and he blew her off." The interviewer later asked Dickinson about the Cosby encounter from her book, to which Dickinson is quoted as responding, " 'Oh, he's so sad.' " Dickinson did not mention rape in the published portion of the interview.

3.      *The November 18, 2014 Disclosure*

By late 2014 – 12 years after Dickinson's book had been published – other women had publicly accused Cosby of drugging and raping them. On November 18, 2014, in a television interview with *Entertainment Tonight*, Dickinson disclosed that Cosby had raped her. By this time, Dickinson had become a successful reality television personality. Her accusation garnered substantial media attention.

Cosby would subsequently make much of the point that, in addition to accusing him of rape, Dickinson may have also accused him of killing the rape story in her autobiography. A story on ETOnline states that Dickinson wanted to write about the rape, "but claims that when she submitted a draft with her full story to HarperCollins, Cosby and his lawyers pressured her

4

and her publisher to remove the details." While it is true that the ETOnline story states this, it is not completely clear whether Dickinson had actually made that statement to *Entertainment Tonight* – or instead, ETOnline may have misconstrued Dickinson's explanation as to why the rape was omitted from her autobiography. A transcript of Dickinson's actual interview with *Entertainment Tonight* makes no mention of Cosby or his lawyers pressuring HarperCollins.

4.      *The Demand Letter*

After the *Entertainment Tonight* interview went public, several media outlets contacted the Cosby camp, indicating an intention to run follow-up stories and seeking Cosby's comment. In response, that same day, Singer, on behalf of Cosby, sent a demand letter to the executive producer of *Good Morning America*, with similar letters to other media outlets. The demand letter was over two pages long, on letterhead from Singer's law firm, and began with the warnings: "<u>CONFIDENTIAL LEGAL NOTICE</u>" and "<u>PUBLICATION OR DISSEMINATION IS PROHIBITED</u>."

The body of the letter started with, "We are litigation counsel to Bill Cosby. We are writing regarding the planned *Good Morning America* segment interviewing Janice Dickinson regarding the false and outlandish claims she made about Mr. Cosby in an *Entertainment Tonight* interview, asserting that he raped her in 1982 (the 'Story'). That Story is fabricated and is an outrageous defamatory lie. In the past, Ms. Dickinson repeatedly confirmed, both in her own book and in an interview she gave to the *New York Observer* in 2002, that back in 1982 my client 'blew her off' after dinner because she did not sleep with him. Her new Story claiming that she had been sexually assaulted is a

defamatory fabrication, and she is attempting to justify this new false Story with yet another fabrication, claiming that Mr. Cosby and his lawyers had supposedly pressured her publisher to remove the sexual assault story from her 2002 book.  That never happened, just like the alleged rape never happened.  Prior to broadcasting any interview of Ms. Dickinson concerning my client, you should contact HarperCollins to confirm that Ms. Dickinson is lying."

The next paragraph explained that Cosby and his team had no contact with HarperCollins about any story planned for the book.  It stated, "You can and should confirm those facts with HarperCollins.  Because you can confirm with independent sources the falsity of the claim that my client's lawyers allegedly pressured the publisher to kill the story, it would be extremely reckless to rely on anything Ms. Dickinson has to say about Mr. Cosby since the story about the publisher is patently false."

The letter continued, again repeating that both the rape allegation and interference with HarperCollins were false – and asserting that HarperCollins could confirm this.  It threatened, "If you proceed with the planned segment with Janice Dickinson and if you disseminate her Story when you can check the facts with independent sources at HarperCollins who will provide you with facts demonstrating that the Story is false and fabricated, you will be acting recklessly and with Constitutional malice."  Singer stated, "It would be extraordinarily reckless to disseminate this highly defamatory Story when Ms. Dickinson herself told an entirely different story in her book," confirmed the same story in the *New York Observer* interview, and "when you may independently confirm with her publisher the falsity of her new assertion that my client's lawyers supposedly pressured

6

HarperCollins to delete the alleged rape story from her book, and when her new allegation of rape was made for the first time only now when it appears that she [is] seeking publicity to bolster her fading career."

The letter repeated, "Since at a minimum Ms. Dickinson fabricated the assertion that my client's lawyers pressured the publisher more than a decade ago to take out the sexual assault story – a story we heard now for the first time – it would be reckless to rely on Ms. Dickinson in this matter."

Singer's letter explicitly threatened litigation: "If *Good Morning America* proceeds with its planned segment with Ms. Dickinson and recklessly disseminates it instead of checking available information demonstrating its falsity, all those involved will be exposed to very substantial liability. [¶] You proceed at your peril. [¶] This does not constitute a complete or exhaustive statement of all of my client's rights or claims. Nothing stated herein is intended as, nor should it be deemed to constitute a waiver or relinquishment, of any of my client's rights or remedies, whether legal or equitable all of which are hereby expressly reserved. This letter is a confidential legal communication and is not for publication."

5.      *The Press Release*

The next day, November 19, 2014, Singer issued a press release, which was headed

**"STATEMENT OF MARTIN D. SINGER**
**ATTORNEY FOR BILL COSBY"**

The statement reads, in its entirety, as follows: "Janice Dickinson's story accusing Bill Cosby of rape is a lie. There is a glaring contradiction between what she is claiming now for the first time and what she wrote in her own book and what she told

the media back in 2002. Ms. Dickinson did an interview with the *New York Observer* in 2002 entitled 'Interview With a Vamp' completely contradicting her new story about Mr. Cosby. That interview a dozen years ago said 'she didn't want to go to bed with him and he blew her off.' Her publisher HarperCollins can confirm that no attorney representing Mr. Cosby tried to kill the alleged rape story (since there was no such story) or tried to prevent her from saying whatever she wanted about Bill Cosby in her book. The only story she gave 12 years ago to the media and in her autobiography was that she refused to sleep with Mr. Cosby and he blew her off. Documentary proof and Ms. Dickinson's own words show that her new story about something she now claims happened back in 1982 is a fabricated lie."

6. *Demand for Retraction*

On February 2, 2015, Dickinson's counsel, Lisa Bloom, sent several Cosby attorneys, including Singer, a letter seeking retraction of both the demand letter and the press release. Bloom's letter explains, "Ms. Dickinson has never lied about what happened between her and Dr. Cosby. She did not disclose the complete story in her autobiography or her interview with *New York Observer* per her ghostwriter's and publisher's insistence. Each of these individuals – the two individuals from her publishing house who are most knowledgeable about the book and the suppression of Ms. Dickinson's rape disclosure – confirms that Ms. Dickinson fought to have the entire story, including the rape disclosure, in the book, but they could not allow it for fear that Dr. Cosby would sue or otherwise retaliate against the publisher." Bloom attached declarations from Fenjves and Regan confirming this.

8

In Bloom's letter, she also stated that Singer, on behalf of Cosby, acted recklessly and with malice by circulating the demand letter and press release without confirming the facts with independent third parties.  Not only did Bloom establish that Fenjves and Regan would have confirmed that Dickinson wanted to include the rape in her book, Bloom added, "our sources at HarperCollins inform us that neither Mr. Singer nor anyone from his office has ever contacted HarperCollins to 'confirm that she is lying.' "

Bloom argued that Singer's statements on behalf of Cosby had defamed Dickinson and harmed her reputation.  She demanded that Cosby "immediately publicly correct the record to restore her reputation."

Neither Cosby nor Singer retracted the statements.

7.    *The End of Any Assertion that Cosby Killed the Rape Story in Dickinson's Book*

On February 9, 2015, a week after Bloom's letter requesting a retraction, a telephone conference occurred between Bloom and Cosby's litigation counsel.  According to Cosby's litigation counsel, Bloom "stated that she was retracting Ms. Dickinson's allegation that Mr. Cosby's lawyers had pressured HarperCollins to remove the rape story from the Book."  Bloom denied any retraction.  According to her subsequent declaration, "This is categorically false.  I never made that statement.  What I said was that Ms. Dickinson was not making that claim, nor did she."[2]

---

[2]    Cosby's briefing on appeal relies on Cosby's counsel's recollection of the telephone call to support the repeated assertion that "Dickinson, through her lawyers, ultimately issued a public retraction of her claim that Mr. Cosby influenced the

8.    *The Original Complaint*

On May 20, 2015, Dickinson filed her complaint against Cosby, stating causes of action for (1) defamation, (2) false light, and (3) intentional infliction of emotional distress.  Her complaint alleged that Cosby had drugged and raped her, and she recently disclosed this publicly.  "In retaliation, Cosby, through an attorney, publicly branded her a liar and called her rape disclosure a lie with the intent and effect of revictimizing her and destroying the professional reputation she's spent decades building."

The complaint alleged that both Singer's demand letter and his press release were defamatory.  She specifically alleged that the demand letter was sent to *Entertainment Tonight* and BuzzFeed.com.[3]  She also alleged that both the demand letter and the press release were broadcast and republished by thousands of media entities worldwide as Cosby "foresaw and intended."

Dickinson pleaded that Cosby's refusal to retract the statements after having been provided with evidence confirming that her claims were not recently fabricated "constitutes actual malice."  She also argued that failure to retract "constitutes

_____

content published in the Autobiography."  The evidence does not support the statement.  There is no evidence that Bloom ever issued a "public retraction"; at most, she privately retracted it in a conversation with Cosby's counsel – a statement she disputes.  Dickinson also disputes that she ever asserted that Cosby had pressured HarperCollins to remove the rape story.

[3]    As we shall explain, this allegation was mistaken with respect to *Entertainment Tonight* – an error which resulted in additional briefing when the trial court called it to the parties' attention.

[Cosby's] acceptance, endorsement and ratification" of Singer's statements.

The false light cause of action was based on the same statements which supported the defamation cause of action. The intentional infliction of emotional distress cause of action relied on the two statements and Cosby's further conduct at a stand-up comedy show in January 2015. During his show, a woman stood up to leave. When Cosby asked where she was going, she said she was going to get a drink. Cosby responded, "You have to be careful about drinking around me." Dickinson alleged that this "comment was intended by Defendant Cosby to mock, insult, demean and humiliate Ms. Dickinson and his other accusers."

9. *Cosby Demurs*

On June 22, 2015, Cosby demurred to the complaint, for failure to state a claim. The demurrer was later taken off calendar in light of the events we next describe.

10. *Cosby's Anti-SLAPP Motion*

That same day, Cosby filed his anti-SLAPP motion.

"The anti-SLAPP statute does not insulate defendants from any liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity. Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a 'summary-judgment-like procedure.' [Citation.]" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384, fn. omitted.)

11

To meet his initial burden under the first part of the anti-SLAPP procedure, Cosby argued that both the demand letter and press release constituted speech in connection with a public issue. (Code Civ. Proc., § 425.16, subd. (e)(4).) The trial court would ultimately agree with this position, and Dickinson does not contest it on appeal. We therefore say no more about Cosby's establishment of the first prong. The real battleground in this case was always the second prong, whether Dickinson could demonstrate a probability of prevailing on her complaint.

Cosby argued that Dickinson could not prevail to the extent her causes of action were based on the demand letter, because the demand letter was a pre-litigation communication protected by the absolute litigation privilege. (Civ. Code, § 47.) As to both the demand letter and the press release, Cosby argued that Dickinson could not prevail on her defamation cause of action because both statements were, in actuality, privileged opinion – both as an opinion based on disclosed facts and as a so-called "predictable opinion." He also argued that Dickinson would be unable to establish defamation damages because the real "sting" of the statements was that Dickinson was generally a liar. This would not be actionable because: (1) she admittedly lied about the rape in her autobiography, so the accusation that she was a liar was true; and (2) Dickinson already had cultivated the professional reputation of a liar, so she was not harmed by the accusation.

Cosby also put forth a series of arguments based on the fact that the statements had been made by Singer, rather than Cosby himself. Cosby argued that he could not be held liable for Singer's conduct without evidence that he furnished or approved the statements. A failure to retract is not sufficient. He further

12

argued that since Dickinson was a public figure, she could only prevail on her defamation cause of action if she established actual malice. He claimed that Singer had not acted with actual malice; and that, even if he had, Singer's malice could not be imputed to him as Singer's principal via respondeat superior.

Finally, Cosby argued that the false light and intentional infliction of emotional distress causes of action were duplicative of the defamation claim and subject to the same defenses.

Cosby supported his anti-SLAPP motion with Singer's declaration. Singer explained how he came to draft the two statements and why he believed their contents were true. He argued that the assertion that Cosby's attorneys had pressured HarperCollins to remove the rape story from Dickinson's autobiography "was integral to the claims" Dickinson had asserted in her *Entertainment Tonight* interview, so he "conducted an investigation which established that this assertion was provably false." Singer believed his demand letter and press release were true, based on: (1) his knowledge that Cosby's attorneys had not pressured HarperCollins; (2) his understanding that Dickinson's autobiography had told a different story; (3) his prior experience with Dickinson in which she had made false claims against another Singer client; and (4) some internet research which revealed articles and commentary characterizing Dickinson as a substance abuser and liar.

At no point in Singer's declaration does he state that he actually spoke with Cosby to determine whether Dickinson's accusation of rape was true. Nor did Cosby file a declaration in support of the anti-SLAPP motion denying the rape accusation.

11.    *The Discovery Issue*

The filing of an anti-SLAPP motion stays all discovery. (Code Civ. Proc., § 425.16, subd. (g).)  "The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision."  (*Ibid.*)

As Cosby's anti-SLAPP motion had put Singer's malice into question, Dickinson moved to lift the discovery stay to depose Cosby and Singer on the issue.

On November 2, 2015, the court granted Dickinson's motion, vacating the discovery stay to allow Dickinson to depose both Cosby and Singer on malice.  At Cosby's request, the court stayed its order to enable Cosby to challenge the ruling by writ.

Cosby filed a writ petition in this court.  He argued that Dickinson had no right to discovery on actual malice until she could establish a reasonable probability of proving the other elements of her causes of action.

In opposition to Cosby's writ petition, Dickinson argued that the depositions she sought were necessary not only for the issue of malice, but also to enable her to "establish facts that [Cosby] knew about, directed, approved and ratified" the statements.

In reply, Cosby argued that the sole issue raised by the writ proceeding was "whether the Superior Court abused its discretion by ordering discovery on the issue of actual malice *before* requiring full briefing and argument on the legal defenses asserted in Defendant's special motion to strike."  Cosby argued that if any of his defenses "unrelated to malice" were to be successful there would be no need "for burdensome discovery on malice, because the case will have been dismissed."

14

We issued an alternative writ of mandate, directing the trial court to either vacate its order lifting the discovery stay and hear the anti-SLAPP motion on the merits to determine if Dickinson has a reasonable probability of "establishing the elements of her defamation action other than actual malice" or to show cause why not. The trial court complied with the alternative writ. It vacated its order lifting the discovery stay and indicated that it would hear the anti-SLAPP motion on the merits to determine whether Dickinson had a reasonable probability of establishing the elements of her defamation action other than actual malice.

In light of the court's order, we dismissed the writ petition as moot.

12. *First Amended Complaint*

On November 16, 2015, while the writ proceeding was pending, Dickinson filed her first amendment complaint. The main distinction from the original complaint was that Dickinson now named Singer as an additional defendant.[4] It added an allegation that "[a]t all times relevant herein, Defendant Singer acted at the direction of Defendant Cosby, as an actual and/or apparent agent, authorized representative, press agent, lawyer, servant and/or employee of Defendant Cosby, acting within the course and scope of his respective employment and/or agency." It

---

[4] The complaint also added allegations about two additional November 2014 statements by Cosby, through Singer, which did not name Dickinson specifically, but spoke in disparaging terms about all of the women accusing Cosby of rape. As the only amended-complaint issue presented on appeal is the correctness of the trial court's ruling dismissing the complaint as to Singer, we have no occasion to consider the additional allegations mentioned above.

15

alleged that the two statements were issued by "Defendant Cosby through Defendant Singer."

Dickinson specifically alleged that Cosby knew that he had drugged and raped her. She alleged that Singer acted with reckless disregard by, among other things, issuing the statements without conducting a reasonable investigation and/or without interviewing obvious witnesses, including Cosby himself.

13. *Motion to Strike First Amended Complaint*

Cosby moved to strike the first amended complaint, on the basis that a plaintiff is not permitted to file an amended complaint while an anti-SLAPP motion is pending. He argued that the first amended complaint was "nothing more than an 11th-hour attempt to plead around Defendant's pending anti-SLAPP motion."

Singer joined Cosby's motion to strike the first amended complaint, with no substantive argument of his own.

14. *Opposition to Motion to Strike First Amended Complaint*

Dickinson opposed the motion to strike the first amended complaint. She argued that, procedurally, she was permitted to amend because the court had not yet found that Cosby satisfied the first prong of the anti-SLAPP test. Moreover, she argued that she had not been trying to plead around Cosby's anti-SLAPP motion, but was simply attempting to preserve her rights against Singer before the statute of limitations expired.

15. *Singer's Reply in Support of the Motion to Strike the First Amended Complaint*

Both Cosby and Singer filed replies in support of the motion to strike the first amended complaint. Because, as we shall discuss, the court's order as to Cosby's motion is not before us, we focus only on Singer's reply.

Singer argued that Dickinson's suggestion that she filed her amendment to avoid the statute of limitations was belied by the fact that Dickinson knew of Singer's involvement from the beginning and she could have named him in her original complaint. He argued that Dickinson could have (1) amended the complaint before Cosby filed his anti-SLAPP motion; (2) sought leave of court to amend after the anti-SLAPP motion was filed; or (3) commenced a separate action against Singer. But, instead, she did what she was not permitted to do: attempted to amend her complaint after that right was foreclosed by Cosby's filing of an anti-SLAPP motion.

Singer argued that the amendment was not just prejudicial, but "highly prejudicial" to him. Specifically, since a separate action against Singer would now be time-barred, Singer would be prejudiced if the court refused to strike the first amended complaint as to him. He also argued, "Forcing Singer to file multiple motions (i.e., the instant Motion, a subsequent anti-SLAPP motion, and a demurrer) to dispose of the action against him is inherently prejudicial as it unreasonably delays the resolution of the matter."

16. *The First Amended Complaint is Stricken*

The court granted the motion of Cosby and Singer to strike the first amended complaint, concluding that the amendment was procedurally impermissible, given the pending anti-SLAPP motion. The court believed it would cause unfair delay to permit Dickinson to amend based on facts which had been known to her at the commencement of the action.

17. *Dickinson's Opposition to Cosby's Anti-SLAPP Motion*

With the first amended complaint out of the case, the parties returned to briefing Cosby's anti-SLAPP motion.

As to Dickinson's probability of prevailing, Dickinson argued that the demand letter was not protected pre-litigation conduct because the privilege applies only if litigation was under "serious consideration." Dickinson argued that there was no evidence that Cosby seriously considered litigation and, in fact, he never sued any of the media outlets he had threatened with legal action.

As to whether she could establish both statements were defamatory, Dickinson argued that the statements were not protected opinion, but instead provably false assertions of fact. She also argued that she had been harmed by the statements.[5]

Dickinson supported her motion with declarations of friends, who stated that Dickinson had told them about the rape in 1982, shortly after it happened. She included the declarations of ghostwriter Fenjves and publisher Regan, who agreed that Dickinson had told them about the rape and wanted to include it in the book. She relied on the declaration of her counsel, Bloom, who countered Cosby's assertion that she had "retracted" any allegation that Cosby had influenced HarperCollins to omit the rape story from Dickinson's book; stating instead that she denied Dickinson had ever made that claim. Finally, she included the declaration of her agent, who had personal knowledge that she had lost jobs as a result of being branded a liar by Cosby on the "very difficult and painful subject of rape."

---

[5] Despite the fact that the motion had been permitted to proceed on the merits *except* for the issue of malice, Dickinson briefed malice in an abundance of caution. She also briefed Singer's agency to act for Cosby.

18. *Cosby's Reply*

In reply, Cosby repeated his prior arguments. He again argued that the demand letter was protected pre-litigation conduct. He argued that the "gist" of the two statements was "that Plaintiff is not a truth teller, or put another way, a liar." Armed with that characterization of the statements, he argued that the statements were both opinion and true.

19. *First Hearing*

A hearing was held on February 29, 2016. At the hearing, the court expressed confusion that plaintiff's complaint had referred to a demand letter which had been sent to *Entertainment Tonight* and BuzzFeed.com whereas Cosby's anti-SLAPP motion relied on a demand letter sent to *Good Morning America*.

The court also asked Cosby if he was asserting the litigation privilege with respect to the press release. The hearing was continued for further briefing.

20. *Cosby's Supplemental Briefing*

In Cosby's March 8, 2016 briefing, Cosby argued that the complaint was in error; there was no demand letter to *Entertainment Tonight*. Cosby attached the declaration of Singer authenticating the demand letter he sent to BuzzFeed.com. The letter was virtually identical to the letter he had sent to *Good Morning America*. It had been attached to a cover e-mail saying, "PLEASE SEE ATTACHED CONFIDENTIAL LEGAL NOTICE REGARDING THE ABOVE SUBJECT."

The brief also stated, "Defendant is not asserting the litigation privilege as to Mr. Singer's November 19, 2014 press statement, nor is he pursuing on this Special Motion to Strike the arguments advanced in the opening brief regarding agency and actual malice."

19

21.    *Dickinson's Supplemental Briefing*

Dickinson again argued that the litigation privilege could not apply to the demand letter because the privilege only applies when litigation is contemplated in good faith and under serious consideration, which she believed to be a disputed issue of fact.

22.    *Second Hearing*

At the continued hearing, the focus was on whether Dickinson had established a probability of prevailing.

As to the demand letter, the court concluded it was a pre-litigation communication in connection with proposed litigation contemplated in good faith and under serious consideration; thus, it was subject to the litigation privilege. The court therefore concluded the litigation privilege defeated all three of Dickinson's causes of action to the extent they were based on the demand letter, and granted the anti-SLAPP motion in part. (See *Baral v. Schnitt, supra,* 1 Cal.5th at p. 382 [an anti-SLAPP motion can be granted as to a portion of a cause of action].)

As to the press release, the court reached a different result. First, the court rejected Cosby's argument that the gist of the press release was simply that Dickinson was a liar. Instead, the court believed that the gist of the statement was that "plaintiff is lying about the rape occurring." The court therefore rejected Cosby's argument that the press release constituted opinion rather than fact. The court stated, "In other words, either the rape did occur or it did not occur. And in this regard, Dickinson is either telling the truth or not telling the truth. The press statement presents the factual assertion that the rape did not occur and that Dickinson is lying. Plaintiff's factual position, on the other hand, is that the rape did occur and thus, she is not lying, contrary to what the press statement says about

20

Dickinson." The court acknowledged that Dickinson presented evidence that she had disclosed the rape to friends, and her publisher, long before Cosby's other accusers came forward. This was sufficient evidence to establish a prima facie case that Cosby did rape her and the press release was therefore false.

The court further concluded that Dickinson could establish all elements of defamation, including damages. The court rejected Cosby's assertion that Dickinson could not establish damages because she had already cultivated the reputation of a liar. The court stated, "Lying about trivial things that are made to entertain an audience does not mean that plaintiff's reputation is so tainted that she's impervious to a reputational harm for being accused of lying about a horrific incident to intentionally harm defendant Cosby's reputation." The court similarly found Dickinson could establish the elements of false light and intentional infliction of emotional distress with respect to the press release. Finding that Dickinson had established a probability of prevailing on all three of her causes of action, the court denied the anti-SLAPP motion as to the press release.

Despite the fact that Cosby had specifically withdrawn his arguments regarding malice, the court addressed the issue, stating that there was no evidence that Singer had investigated whether Cosby had raped Dickinson prior to issuing his statements denying the rape. Similarly, despite the fact that Cosby had specifically withdrawn his arguments regarding agency, the court addressed that issue as well, stating that Cosby had ratified Singer's statements by failing to retract them.[6]

---

[6] The court later acknowledged that Cosby had withdrawn his arguments regarding agency and actual malice, and stated, "For purposes of this special motion to strike only, the court

21

23. *Notices of Appeal*

Dickinson filed a timely notice of appeal from the original order striking her first amended complaint. Cosby filed a timely notice of appeal from the ruling on the anti-SLAPP motion, to the extent it denied his motion with respect to the press release. Dickinson filed a timely notice of cross-appeal from the same ruling, to the extent it granted Cosby's motion with respect to the demand letter.

24. *Limitation of Issues on Appeal*

    A. <u>Cosby is Not a Party to the Appeal of the Order Striking the First Amended Complaint as to Singer</u>

Cosby and Singer both moved to dismiss Dickinson's appeal from the order striking her first amended complaint. On May 27, 2016, we dismissed Dickinson's appeal from that order as it relates to Cosby (as the order was not appealable as to him), but denied the motion to dismiss the appeal as it pertains to Singer,

---

construes this as an admission that he [Cosby] does not have evidence to rebut his [*sic*] showing of the actual malice. For purposes of this special motion to strike, the element of malice is satisfied. As such, the court finds that a continuance of this hearing for plaintiff to conduct limited discovery at this time on the issue of malice is not required." We need not decide whether Cosby's position was an actual admission. Cosby's withdrawal of his argument on malice may have been a recognition that the scope of his anti-SLAPP motion had been narrowed in response to his efforts to avoid discovery on the issue of malice – not a concession that Dickinson had presented sufficient evidence of malice. However, on appeal, Cosby does not argue that the court's rulings on malice and agency were premature, and that his anti-SLAPP motion should be reconsidered on those issues only, after Dickinson is permitted to conduct limited discovery.

as the order could be construed as a final judgment in favor of Singer.

Following that order, Cosby alone withdrew those portions of his respondent's brief which addressed the motion to strike the first amended complaint.

B.  Singer is Not a Party to the Cross-Appeals Regarding the Anti-SLAPP Ruling

The parties established a consolidated briefing schedule and filed briefs accordingly.  In Singer's respondent's brief in connection with Dickinson's appeal of the order striking her first amended complaint against him, Singer included over 20 pages of briefing under the heading, "THIS COURT SHOULD AVOID ISSUING ANY DECISION ON WHETHER SINGER COULD PREVAIL ON AN ANTI-SLAPP MOTION AGAINST DICKINSON.  AT ANY RATE, DICKINSON'S LAWSUIT SHOULD BE STRICKEN."  This included lengthy arguments under the subheadings, "The trial court properly granted Cosby's anti-SLAPP motion as to claims based on Singer's demand letter" and "The trial court erroneously denied Cosby's anti-SLAPP motion as to claims based on Singer's press statement."  In her reply brief, Dickinson argued this court should disregard Singer's briefing pertaining to the cross-appeals of the order on Cosby's anti-SLAPP motion.  Singer's counsel responded with a supplemental letter brief, arguing that Singer is permitted to address the issues as briefing in the appeals was consolidated. Singer further argued that, if Dickinson's first amended complaint is reinstated against him, any ruling we might make in favor of Dickinson in connection with Cosby's anti-SLAPP motion could have an injurious effect on any future anti-SLAPP motion

23

Singer may bring. In the alternative, he argued that we should consider his briefing as that of an amicus curiae.

Singer's only involvement as a party in this litigation was to successfully join in Cosby's motion to strike the first amended complaint. Once that motion was granted, Singer was no longer a party to the lawsuit. He did not purport to brief the anti-SLAPP motion; his only involvement was as a witness submitting a declaration. If Dickinson had never filed the first amended complaint, Singer would have had no right to appear as a party in the appeal or to file a brief without obtaining leave of court. That he is the respondent in Dickinson's appeal of the order striking her first amended complaint does not give him appellate rights with respect to the Cosby/Dickinson anti-SLAPP cross-appeals.

Nonetheless, we acknowledge Singer's request that we not issue any opinion which may prejudice his right to pursue an anti-SLAPP motion in the future, and we consider his briefing of the anti-SLAPP issues in that light. We do not address whether anything in the trial court's rulings, or our opinion, may have any preclusive effect in any further litigation between Dickinson and Singer, as that issue is not before us.

C.  Malice and Agency are Not Before Us

On appeal, Cosby briefs the issues of malice and agency on the merits – despite the fact that he had expressly withdrawn his arguments on both malice and agency before the trial court ruled on his anti-SLAPP motion. The issues were withdrawn; we therefore do not address them. Although the trial court briefly addressed malice and agency at the hearing on the anti-SLAPP motion, the court's statements must be characterized as dicta, as the issues were no longer before it.

Because Cosby withdrew the arguments, we do not address whether Cosby is liable for Singer's statements and whether Cosby and/or Singer acted with actual malice. Cosby simply excluded these issues from the scope of his anti-SLAPP motion. The parties cannot now revive them.

25. *The Issues Before the Court*

Stripped of briefing on irrelevant issues, the appeal before us presents the following issues: (1) When a defendant's anti-SLAPP motion is pending, is the plaintiff precluded from amending her complaint to name an additional defendant? (2) Was the demand letter in this case a pre-litigation communication protected by the absolute litigation privilege? (3) Do the press release and demand letter contain statements of fact, capable of being proven false, which support a defamation cause of action? (4) Is the gist of the statements defamatory? and (5) Should Dickinson's false light and intentional infliction of emotional distress causes of action have been stricken?

## DISCUSSION

1. *Dickinson's Absolute Right to Amend Her Complaint to Add a Defendant Was Not Foreclosed by Cosby's Anti-SLAPP Motion*

The first amended complaint was filed November 16, 2015. At that time Code of Civil Procedure section 472 provided, in pertinent part, "Any pleading may be amended once by the party of course, and without costs, at any time before the answer or demurrer is filed, or after demurrer and before the trial of the issue of law thereon, by filing the same as amended and serving a

25

copy on the adverse party, . . ."[7]  The right to file an amended pleading during this time, without leave of court, includes the right to file an amended complaint to add new parties.  (*Gross v. Department of Transportation* (1986) 180 Cal.App.3d 1102, 1105.)  Here, Cosby had not answered; and while he had filed a demurrer, it had not yet been heard.  The amendment thus was offered "before the trial on the issue of law thereon."  Accordingly, Dickinson had a statutory right to file her first amended complaint naming Singer.

Singer argues, however, that Cosby's filed anti-SLAPP motion cut off Dickinson's right to amend to name a new party.  As we will discuss, there is a solid line of case authority discussing limitations on a plaintiff's right to amend the complaint when an anti-SLAPP motion is pending.  However, the parties and amici have not cited, and independent research has not disclosed, any authority discussing the precise scenario at issue here – where the party challenging the plaintiff's right to amend has not filed an anti-SLAPP motion and, in fact, is named as a new party to the litigation.  As we now discuss, our review of the language in and policy behind the cases restricting amendment when an anti-SLAPP motion is pending do not support extending their holdings to cases where the plaintiff amends to add an additional defendant.

---

[7]    The current version of the statute, operative January 1, 2016, replaces the arcane "trial on the issue of law thereon" with "before the demurrer is heard" and further restricts the right to file an amended pleading without leave of court to amendments "filed and served no later than the date for filing an opposition to the demurrer."

We begin our discussion with a simple premise. Although the anti-SLAPP statute does not specifically state it, a plaintiff whose complaint is stricken by a successful anti-SLAPP motion cannot try again with an amended complaint. There is no such thing as granting an anti-SLAPP motion with leave to amend.[8] (*Mobile Medical Services, etc. v. Rajaram* (2015) 241 Cal.App.4th 164, 167; *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 629.)

The appellate courts have also addressed whether a plaintiff could avoid that bar if he or she amended after the court indicated its intention to grant the anti-SLAPP motion, but before the court actually ruled. The court in *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068 answered the question in the negative. At issue in *Simmons* was Simmons's cross-complaint, and the cross-defendant's anti-SLAPP motion. At the hearing on the anti-SLAPP motion, Simmons as counsel, "faced with an adverse tentative ruling, asked the court to grant Simmons leave to amend the cross-complaint." (*Id*. at p. 1072.) Counsel sought to "remove any allegations that might be 'objectionable' under the anti-SLAPP statute." (*Id*. at p. 1073.) The court denied leave and granted the anti-SLAPP motion. (*Id*. at p. 1072.) On appeal, the Court of Appeal affirmed, reasoning as follows: "Allowing a

---

[8] In *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, the trial court did, in fact, purport to grant an anti-SLAPP motion with leave to amend. (*Id*. at p. 869.) In that case, a slander plaintiff had failed to plead actual malice; however, in opposition to the anti-SLAPP motion, she presented sufficient evidence of it. (*Id*. at p. 862.) The trial court granted the anti-SLAPP motion with leave for plaintiff to amend her complaint to allege malice. (*Id*. at p. 869.) The Court of Appeal construed this as an order which "effectively denied" the anti-SLAPP motion. (*Id*. at p. 865.)

SLAPP plaintiff leave to amend the complaint once the court finds the prima facie showing has been met would completely undermine the statute by providing the pleader a ready escape from section 425.16's quick dismissal remedy. Instead of having to show a probability of success on the merits, the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious nature of the suit through more artful pleading. This would trigger a second round of pleadings, a fresh motion to strike, and inevitably another request for leave to amend. [¶] By the time the moving party would be able to dig out of this procedural quagmire, the SLAPP plaintiff will have succeeded in his goal of delay and distraction and running up the costs of his opponent. [Citation.] Such a plaintiff would accomplish indirectly what could not be accomplished directly, i.e., depleting the defendant's energy and draining his or her resources. [Citation.] This would totally frustrate the Legislature's objective of providing a quick and inexpensive method of unmasking and dismissing such suits. [Citation.]" (*Id*. at pp. 1073-1074.)

One might then ask how far back the prohibition goes. That is, what is the first point in the process leading to a successful anti-SLAPP ruling at which the plaintiff is prohibited from amending the complaint? *JKC3H8 v. Colton* (2013) 221 Cal.App.4th 468 establishes that the point is no earlier than the filing of the anti-SLAPP motion. When a plaintiff files an amended complaint before the defendant files an anti-SLAPP motion – even by a matter of hours – the amended complaint is effective and the defendant has no right to a hearing on the anti-SLAPP motion directed to the original complaint. (*Id*. at pp. 475, 478.)

There is a disagreement in the appellate courts as to whether the bar to amendment comes into effect as soon as the defendant files an anti-SLAPP motion, or instead only if the court has indicated the anti-SLAPP motion has some level of merit. (Compare *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1280, 1294 [extending the rationale of *Simmons* to bar attempts to amend after an anti-SLAPP motion is filed and before it is heard] with *Mobile Medical Services, etc. v. Rajaram, supra,* 241 Cal.App.4th at p. 171 [the amendment bar comes into effect once the court has found the defendant has met its burden on the first prong of the anti-SLAPP motion] and *Law Offices of Andrew L. Ellis v. Yang* (2009) 178 Cal.App.4th 869, 881 [same].)

We need not stake out a position in this debate because even if we hold that the *Simmons* analysis applies as soon as the defendant files an anti-SLAPP motion, *Simmons* says nothing about an amendment to add a new defendant so it is not controlling of the issue presented to us. However, we take guidance from the courts which have interpreted *Simmons* as not actually preventing the plaintiff from filing an amended complaint; but instead permitting the plaintiff to file its amendment, without depriving the defendant of its right to have its anti-SLAPP motion adjudicated with respect to the initial complaint.

This hybrid result is best illustrated by *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049. In that case, Sylmar filed a cross-complaint and Pueblo filed an anti-SLAPP motion addressed to the fraud cause of action in the cross-complaint; Pueblo also demurred to the cross-complaint. Three days prior to the hearing on the anti-SLAPP motion and demurrer, Sylmar filed a first

29

amended cross-complaint, pleading the fraud cause of action in greater detail. The trial court took the demurrer off calendar, but nonetheless granted the anti-SLAPP motion and struck the fraud cause of action, and awarded Pueblo attorney fees as prevailing party on the anti-SLAPP motion. (*Id*. at pp. 1052-1053.) On appeal, Sylmar argued that the court erred in considering the anti-SLAPP motion, as it had amended its complaint as a matter of right prior to the hearing. Division Four of our court disagreed. As between the anti-SLAPP statute and Code of Civil Procedure section 472, the court stated, "We discern no conflict between the two sections. Sylmar received the benefit of section 472 when it was permitted to file the first amended complaint. The filing of the first amended complaint rendered Pueblo's demurrer moot since ' "an amendatory pleading supersedes the original one, which ceases to perform any function as a pleading. [Citations.]" [Citation.]' [Citation.] The trial court agreed that the demurrer was moot and took it off calendar." (*Id*. at p. 1054.) However, the court refused to read section 472 as an implied condition to the operation of the anti-SLAPP law. "Thus, we conclude the determination of Pueblo's claim for attorney fees and costs was not moot and the trial court did not err in addressing the merits of the SLAPP motion. [Citations.]" (*Id*. at p. 1056.)

In short, *Sylmar* held that the cross-complainant was entitled to file the first amended cross-complaint under Code of Civil Procedure section 472, and the first amended cross-complaint was given effect with respect to the then-pending demurrer; however the amendment did not override the cross-defendant's right to adjudication of its then-pending anti-SLAPP motion on the original cross-complaint.

To similar effect are the cases holding that, if a plaintiff voluntarily dismisses the case prior to the hearing on the anti-SLAPP motion, the court loses jurisdiction to rule on the anti-SLAPP motion, but retains the limited jurisdiction to consider the merits of the motion in order to decide if attorney fees and costs should be awarded the successful defendants.  (E.g., *Law Offices of Andrew L. Ellis v. Yang, supra,* 178 Cal.App.4th at pp. 875-876.)  In short, the dismissal is given effect, but the defendant does not lose its anti-SLAPP right to recover fees if its motion would have been successful.  (*Id.* at p. 879.)

When applied to this case, it would mean that, regardless of whether the case had proceeded to the point where Dickinson's amendment as to Cosby could not preclude a hearing on his anti-SLAPP motion (an issue not before us), Dickinson's amendment as to Singer should have been given immediate effect under Code of Civil Procedure section 472.  Singer had not filed an anti-SLAPP motion so there was no basis for the trial court to strike the first amended complaint as to him.

Our conclusion does not detract from the strong policy interests identified in *Simmons* and other cases.  Those cases are concerned that to allow a complaint against a party to be amended when that party's anti-SLAPP motion is about to be granted (or even pending) may give the plaintiff a second bite at the apple of pleading a complaint sufficient to survive an anti-SLAPP motion.  Yet, anti-SLAPP is designed as a final remedy with no second chances.  Allowing a plaintiff to name a new defendant when an anti-SLAPP motion is proceeding as to the original defendant will not implicate these concerns.  The motion

31

will rise or fall on its own merits whether the second defendant is a party or not.**9**

We reach the same result when considering the issue from the perspective of the statutory right to amend. Code of Civil Procedure section 472 grants the plaintiff an absolute right to amend to add a new defendant prior to a hearing on a demurrer. There is no reason the new defendant should be able to avoid

---

**9** After briefing had been completed in this appeal, Division One of the Second District Court of Appeal decided *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, petition for review filed October 2, 2017. In *Okorie*, plaintiffs argued the trial court incorrectly granted an anti-SLAPP motion with respect to several causes of action in their complaint. One cause of action was a federal civil rights claim, which plaintiffs conceded on appeal was fatally flawed, as it had been brought against an entity immune from suit under the 11th Amendment. On appeal, the plaintiffs argued that the court nonetheless erred in granting the anti-SLAPP motion with respect to this cause of action, as they could have named other (non-immune) defendants in an amended complaint following discovery. The appellate court disagreed, stating, "Whether Plaintiffs could have filed an amended complaint that could have successfully identified individual defendants against whom the federal civil rights claim could have been asserted is a question that we cannot consider. Under the anti-SLAPP analysis, we, like the trial court, must take the challenged pleading as we find it." (*Id.* at p. 598.) *Okorie* does not undermine our conclusion. The court there was not faced with an otherwise timely amendment and a new defendant attempting to avoid liability because an existing defendant had an anti-SLAPP motion pending. We agree with the *Okorie* court's analysis – consideration of Cosby's anti-SLAPP motion is properly based on the complaint to which it was addressed; the amendment as to Singer has no effect on that analysis.

being added to the complaint simply because an existing defendant has an anti-SLAPP motion pending. On appeal, Singer argues only that the amendment "threatened to moot Cosby's anti-SLAPP motion challenging the initial complaint and to trigger the new round of anti-SLAPP litigation the statute is meant to prevent." Yet this pertains only to Dickinson's attempt to amend as to Cosby; it has nothing to do with Singer.

Finally, we are not persuaded by Singer's argument that he would have been prejudiced by the denial of his motion to strike. He argued that he would have suffered harm because, without the first amended complaint, the claim against him would have been time-barred. But having to face a timely lawsuit is not the type of prejudice from which the law protects a defendant, and it certainly has nothing to do with Cosby's anti-SLAPP motion. Singer also argued, "Forcing Singer to file multiple motions (i.e., the instant Motion, a subsequent anti-SLAPP motion, and a demurrer) to dispose of the action against him is inherently prejudicial as it unreasonably delays the resolution of the matter." But he was not forced to file the motion to strike the complaint and, as we conclude here, it should not have been filed or granted. An anti-SLAPP motion and demurrer are typical filings in any case implicating protected speech and are not prejudicial. The idea that these three motions "unreasonably delay[] the resolution of the matter" is also not prejudicial. The case against Singer did not commence until the filing of the first amended complaint, and, in the normal course, would have proceeded apace. There is no prejudice to Singer here.[10]

---

[10]     To the extent Singer is arguing that allowing the amendment against him would have prejudiced Cosby by

33

In fact, if any party was at risk of unfair prejudice, it is Dickinson. As we shall discuss, Cosby's anti-SLAPP motion was correctly denied with respect to the press release and should have been denied with respect to the demand letter. Nonetheless, Singer would have us affirm the dismissal of the complaint against him – thereby protecting him from any timely suit being pursued by Dickinson – simply due to the circumstance that Cosby, his eventual co-defendant, had filed an ultimately unmeritorious anti-SLAPP motion at the time Dickinson sought to include Singer as a defendant. We fail to see how justice is served by granting Singer a windfall immunity based on Cosby's pursuit of a meritless motion.

We therefore reverse the trial court's order striking Dickinson's first amended complaint as to Singer.

2. *The Anti-SLAPP Motion Should Have Been Granted in its Entirety*

A. <u>Introduction and Standard of Review</u>

We now turn to Cosby's anti-SLAPP motion, specifically, the second prong of the analysis and whether Dickinson has established a probability of prevailing on her defamation cause of action. We conclude that she has.

"Review 'of an order granting or denying a motion to strike under 425.16 is de novo. [Citation.] We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." [Citation.] However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to

_____

delaying resolution of his anti-SLAPP motion we are unpersuaded. Even if true, that is not Singer's concern.

determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.]" (*GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 150.)

B.     The Litigation Privilege Does Not Defeat Cosby's
Claims at the Anti-SLAPP Motion Stage

The first question we address is Cosby's affirmative defense that the demand letter is protected by the litigation privilege.[11]

"The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' [Citation.] 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.]" (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).) The privilege is given a broad interpretation. (*Ibid.*)

The privilege is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior to litigation. (*Action Apartment, supra,* 41 Cal.4th at p. 1241.) Not all pre-litigation conduct is subject to the privilege. The test is: "To be protected by the litigation privilege, a communication must be 'in furtherance of the objects of the litigation.' [Citation.]

---

[11]     Cosby did not argue that the litigation privilege extends to the press release. He was correct not to do so. The litigation privilege does not extend to press releases. (*GetFugu, Inc. v. Patton Boggs LLP, supra,* 220 Cal.App.4th at pp. 153-154; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1149.)

This is 'part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action.' [Citation.] A prelitigation communication is privileged only when it relates to litigation that is *contemplated in good faith and under serious consideration.* [Citations.]" (*Id.* at p. 1251, emphasis added.)

Under this standard, a demand letter written by an attorney can fall within the litigation privilege. (See, e.g., *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 577-578.) However, a demand letter is privileged pre-litigation conduct only when it relates to litigation contemplated in "good faith and under serious consideration." (*Action Apartment, supra,* 41 Cal.4th at p. 1251.) The element that litigation must be under serious consideration was emphasized in *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 35, fn. 10: "The classic example of an instance in which the privilege would attach to prelitigation communications is the attorney demand letter threatening to file a lawsuit if a claim is not settled. [Citation.] Nevertheless, because the privilege does not attach prior to the actual filing of a lawsuit unless and until litigation is seriously proposed in good faith for the purpose of resolving the dispute, even a threat to commence litigation will be insufficient to trigger application of the privilege if it is actually made as a means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit." (*Ibid.*) Stated slightly differently, "By the same token even a threat to file a lawsuit would be insufficient to activate the privilege if the threat is merely a negotiating tactic and not a serious proposal made in good faith contemplation of going to court." (*Id.* at p. 35.) The reason for the rule is that a successful invocation of the privilege results in

36

the bar of a potentially meritorious claim. " 'No public policy supports extending a privilege to persons who attempt to profit from hollow threats of litigation.' [Citations.]" (*Action Apartment, supra,* at p. 1251.)

Whether litigation was contemplated in good faith and under serious consideration are questions of fact. (*Action Apartment, supra,* 41 Cal.4th at p. 1251.) The good faith inquiry is not a question of whether the statement was made with a good faith belief in its truth, but rather, whether the statement was made with a good faith intention to bring a lawsuit. (*Ibid.*) While not dispositive, whether a lawsuit was ultimately brought is relevant to the determination of whether one was contemplated in good faith at the time of the demand letter. (See, e.g., *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 909-910, 920 [defendant sent demand letters to thousands of people who had purchased devices that could pirate defendant's television programming, and ultimately sued many, but not all, of them; filing numerous lawsuits gave rise to an inference that the demand letters were sent in good faith contemplation of litigation]; *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 271-272 [the fact that the defendant did not bring suit did not undermine a finding of good faith when the recipients of the demand letters had largely complied with the demand].)

In this case, in his anti-SLAPP motion, Cosby argued that Dickinson could not establish a probability of prevailing on her causes of action arising from the demand letter, due to the affirmative defense of the litigation privilege. There is some dispute in the case law as to which party bears the burden of proof on an affirmative defense in the context of an anti-SLAPP motion. Some cases state that "although section 425.16 places on

37

the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense.  [Citation.]" (E.g., *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 676.)  Others suggest that the litigation privilege presents " 'a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing.  [Citations.]'  [Citation.]" (E.g., *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1485.)  Given the evidence in this case, we need not resolve the dispute here.  What is important is that, regardless of the burden of proof, the court must determine whether the plaintiff can establish a prima facie case of prevailing, or whether the defendant has defeated the plaintiff's evidence as a matter of law.  (*Blanchard v. DIRECTV, supra,* 123 Cal.App.4th at p. 921; see also *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 434.)

We are concerned with a demand letter, sent by Cosby's attorney, Singer, to *Good Morning America* and other news outlets.  According to Singer's declaration, the genesis of the demand letter was as follows.  After *Entertainment Tonight* broke the story of Dickinson's rape allegations, several media outlets, including *Good Morning America*, contacted Cosby's publicist inquiring about Dickinson's allegations.  Cosby's publicist forwarded the information to Singer, who drafted the demand letter and sent it to those outlets.  The demand letter, which was clearly captioned as a confidential demand letter, stated that Dickinson's allegations were a recently fabricated defamatory lie, and threatened litigation if the outlets were to go ahead with their planned coverage of Dickinson's allegations.  No demand letter was sent to *Entertainment Tonight*, the outlet which

38

originally reported Dickinson's allegations. Singer explained that he sent demand letters "only to media outlets that [he] was aware had expressed the intent to publish Ms. Dickinson's accusations, and requested a response before doing so, to place those media outlets on notice of the falsity of Ms. Dickinson's accusations, and to inform them that the publication of Ms. Dickinson's false and defamatory accusations would be actionable."

Although some, if not all, of the outlets to whom the demand letter was sent ran the story anyway, Cosby did not follow through with his litigation threat.[12] According to Bloom's undisputed declaration, Cosby "has not sued any of these media outlets. Nor has he ever sued any of the thousands of media outlets who have published stories about the over fifty women who have now accused him of attempted or actual sexual assault over the last decade."

Under the circumstances, the facts that: (1) the demand letter was sent *only* to media outlets which had not yet run the story but had indicated an intention to do so; and (2) Cosby never sued any media outlet which ran the story, give rise to an inference that the demand letter was not sent in connection with litigation contemplated in good faith and under serious consideration. Instead, these facts suggest that the demand letter was a bluff intended to frighten the media outlets into silence (at a time when they could still be silenced), but with no intention to go through with the threat of litigation if they were uncowed. Hence the letters were, in the words of our Supreme

---

[12] BuzzFeed.com not only ran the story, it posted Singer's demand letter in its entirety.

Court, "hollow threats of litigation."  (*Action Apartments, supra,* 41 Cal.4th at p. 1251.)

As the evidence supports a prima facie inference that Cosby sent the demand letter without a good faith contemplation of litigation seriously considered, Dickinson made a showing of a probability of prevailing on the merits of the litigation privilege affirmative defense under the second prong of the anti-SLAPP statute.  Accordingly, the trial court erred in granting the motion as to the demand letter.[13]

C.      The Demand Letter and Press Release Contain
         Actionable Statements of Fact, Not Just Opinions

Dickinson's appeal and Cosby's cross-appeal raise the question of whether the demand letter and press release consist of actionable provable facts or only nonactionable opinion.  For Dickinson to prevail on the second prong of the statute, she must demonstrate a probability of prevailing on the merits of her defamation claim.  She cannot do so unless she establishes with respect to both the demand letter and the press release, that her claims are based on provable facts, not protected opinions.  At issue is the nature of the alleged defamatory statements.  We discuss the applicable law, then apply it to the demand letter and press release respectively.

1.      *Defamation Law – Fact and Opinion*

" 'Defamation is "a false and unprivileged publication that exposes the plaintiff 'to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'  [Citation.]"

---

[13]      We do not suggest that as a matter of law Cosby cannot prevail on the litigation privilege defense, only that Dickinson has shown a probability of prevailing at this juncture.

40

[Citations.]' [Citations.] ' "The *sine qua non* of recovery for defamation . . . is the existence of a falsehood." [Citation.]' [Citation.]" (*Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 678.)

Because defamation requires a falsehood, it is sometimes said that an opinion, which is neither true nor false, is not actionable. This is an oversimplification. Statements of opinion do not enjoy blanket protection. (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 384.) The issue is whether the statement of opinion implies a statement of fact. "Statements of opinion that imply a false assertion of fact are actionable. [Citation.]" (*Id.* at p. 385.)

The distinction was illustrated by the United States Supreme Court in *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1. "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: '[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words "I think," ' [Citation.]" (*Id.* at pp. 18-19.)

"The 'crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. [Citation.]' [Citation.] 'Only once the court has

41

determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]' [Citation.] The question is ' "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. . . ." [Citation.]' [Citation.]" (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696.)

To make this determination, we apply a totality of the circumstances test. First, we examine the language of the statement itself, to determine whether the words are understood in a defamatory sense. Second, we examine the context in which the statement was made. (*Franklin v. Dynamic Details, Inc., supra,* 116 Cal.App.4th at p. 385.)

In considering the *language* of the statement itself, we look at whether the purported opinion discloses all of the facts on which it is based and does not imply that there are other, unstated facts which support the opinion. If that is the case, the statement is defamatory only if the disclosed facts themselves are false and defamatory. (*Franklin v. Dynamic Details, Inc., supra,* 116 Cal.App.4th at p. 387.) We also consider whether the statement was cautiously phrased in terms of the author's impression. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260-261.)

In considering the *context* of the statement, we look at facts including the audience to whom the statement was directed (*Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 261 [consider how the average reader of the statement would reasonably have understood it]), the forum in which the statement was made (e.g. *Summit Bank v. Rogers, supra,* 206 Cal.App.4th at p. 699 [anonymous misspelled rants on an

internet board devoted to rants and raves are generally not expected to be taken seriously]), and the author of the statement (e.g. *Franklin v. Dynamic Details, Inc., supra,* 116 Cal.App.4th at p. 389 [finding it significant that the author did not purport to be a lawyer stating opinions as legal truths in legal verbiage]).

Another factor to consider in the context portion of the totality of the circumstances test is whether the statement is so-called "predictable opinion."[14] "Part of the totality of the circumstances used in evaluating the language in question is whether the statements were made by participants in an adversarial setting. '[W]here potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.' [Citation.]" (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401-1402; see also *Information Control v. Genesis One Computer Corp.* (1980) 611 F.2d 781, 784.)

_____

[14] In his brief on appeal, Cosby suggests "predictable opinion" is a defense on its own, based on the common law privilege of self-defense. We disagree; case authority is clear that this is simply part of the totality of the circumstances test. The only case on which Cosby relies for that privilege, *Foretich v. Capital Cities/ABC, Inc.* (4th Cir. 1994) 37 F.3d 1541, does not hold that the common law self-defense privilege is still viable, but simply uses it as a tool in the analysis of whether private individuals making public statements only to defend themselves have nonetheless become limited purpose public figures by having made the statements. (*Id.* at pp. 1559-1560.)

43

We apply these principles and consider the demand letter and press release separately.

>    2.    *The Demand Letter Contains Statements of Fact*

Cosby takes the position that the demand letter is not actionable as it is simply Singer's opinion, based on fully disclosed facts. We disagree. As we shall explain, nearly every factor of the totality of the circumstances test points strongly toward the conclusion that a reasonable fact finder could conclude the demand letter states or implies a provably false assertion of fact – specifically, that Cosby did not rape Dickinson, and she is lying when she says that he did.

We first consider the language of the demand letter. We observe that the letter is not phrased cautiously in terms of opinion. Although not dispositive, the letter does not say, "I believe Dickinson's allegations are false," or "Based on the following facts, I am of the opinion that Dickinson's rape allegation is false." Instead, it states, repeatedly and unconditionally, that Dickinson's rape allegations are "false and outlandish claims," an "outrageous and defamatory lie," a "defamatory fabrication," and "false"; and that "the alleged rape never happened." *Dreamstone Entertainment Ltd. v. Maysalward Inc.* (C.D. Cal. Aug. 18, 2014, No. 2:14-CV-02063-CAS) 2014 WL 4181026, on which Cosby relied at oral argument, is distinguishable. In that case, an attorney's press release discussing a pending lawsuit was held to be nonactionable opinion when part of the statement was cautiously phrased in terms of what a filed complaint alleged, rather than the language

44

of absolute facts. (*Id.* at p. *7.) Here we have no such cautionary language.[15]

Even if we were to assume the absolute factual statements in the demand letter were merely Singer's opinion, the next step in our consideration of the language of the letter is to determine whether the demand letter sets forth the factual basis for such an opinion. To the extent the demand letter sets forth its underlying factual bases, it relies on: (1) the fact that Dickinson's biography and related *New York Observer* interview told a different story; and (2) the fact that Dickinson's purported assertion that Cosby killed the rape story in Dickinson's book was a lie. The demand letter goes on to add (3) that HarperCollins can confirm that both the rape story and the assertions that Cosby pressured HarperCollins to not print it are lies.[16]

There are three reasons why the disclosure of these facts on which Singer's purported opinion is based is insufficient to render the demand letter an opinion based on fully disclosed, non-actionable facts. First, it does not disclose all of the facts on which the opinion is based. Singer's declaration admits that he reached his opinion based on two additional facts – his prior

[15] The only conditional language appears at the end of the letter, where Singer suggests "it appears that [Dickinson is] seeking publicity to bolster her fading career."

[16] We repeat the language of the demand letter relating to HarperCollins's presumed ability to confirm the rape allegations are false: "If you proceed with the planned segment with Janice Dickinson and if you disseminate her Story when you can check the facts with independent sources at HarperCollins who will provide you with facts demonstrating that the Story is false and fabricated, you will be acting recklessly and with Constitutional malice."

45

experience with Dickinson and his internet research into her credibility – but neither of these facts is contained in the letter, making it impossible for the readers to judge for themselves whether the facts support the opinion. Second, Dickinson's evidence is that one of the purported facts – that HarperCollins can prove her rape allegation is false – is itself false. Dickinson's evidence is that she wanted to include the rape in her book, and that HarperCollins knew it and would say so. An opinion based on a provably false fact is itself actionable. Third, and most important, we believe that the language of the demand letter implies an additional fact – indeed, it explicitly states it: "the alleged rape never happened."

For these reasons we find distinguishable a case on which Cosby heavily relied at oral argument. In *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, a disgruntled former employee gave an interview stating, in "colorful" language that the defendant's place of business was an unpleasant place to work. Among other things, defendant stated that his former employer did not want to let his employees see a doctor when injured. This statement could have been actionable fact, but it was immediately followed by a specific retelling of an incident in which the former employee had been injured and his employer had not wanted him to take the time to seek medical assistance – the complete and undisputed factual basis for what was, in context, clearly a statement of opinion. (*Id.* at p. 1053.) Such a complete factual basis is missing in Singer's demand letter, and where a factual basis is present, it is disputed.

While our analysis of the language of the demand letter alone is sufficient to establish a reasonable fact finder could conclude the letter conveys a provably false assertion of fact, an

46

analysis of the context of the letter further supports that conclusion.

The statement was a demand letter, sent only to media outlets who were preparing to run Dickinson's story and had asked the Cosby camp for its response. The letter was written by Cosby's attorney, and framed in legal terms, threatening litigation for future defamatory statements which, Singer argued, would be made "recklessly and with Constitutional malice." This was not an anonymous posting on an internet message board where unsupported rants and raves are expected; this was a lawyer's letter threatening litigation and setting out the factual and legal basis for it.

Most importantly, the letter was sent by Cosby's litigation counsel, on behalf of Cosby. We again observe that, at least for purposes of the present appeal, Cosby has waived any argument that Singer was not acting as his agent when he made the statements at issue in this case. When someone is publicly accused of rape, is asked for a response, and sends back a letter from counsel saying, "the alleged rape never happened," it is reasonable for the recipient of the letter to infer that the accused is, in fact, denying the rape. The "predictable opinion" doctrine does not change this result. The statement is not full of epithets, fiery rhetoric or hyperbole; it is a clear, simple factual denial of the rape as expressed in a lawyer's letter.

The fact that Cosby's attorney authored the statement is an important factor supporting our conclusion. The rape allegations against Cosby were a subject of national attention and much public speculation. It would perhaps be unactionable opinion if an unrelated individual, with no actual knowledge of the rape, chatting in a public forum, were to say, "Dickinson lied about the

rape; after all, she told a different story in her book." That may be unactionable opinion because it is based on disclosed facts and the speaker would not be presumed to be basing the opinion on anything else. But here, the demand letter was authored by Cosby's attorney, who was speaking for Cosby, who, in turn, would certainly know whether or not he sexually assaulted Dickinson. Cosby's agent's absolute denial is a factual one. At the very least, the demand letter is susceptible of this interpretation, which is sufficient to establish Dickinson's burden at this stage of the proceedings.[17]

---

[17] The parties rely, to varying degrees, on federal court decisions arising out of other claims against Cosby for defamation. The claims involve other statements that Singer made on Cosby's behalf, denying other women's claims of sexual assault. As the opinions relate to different statements, and, in nearly all of them, are not applying California law, we find them to be of limited persuasive value. (*McKee v. Cosby* (1st Cir. 2017) 874 F.3d 54 [applying Michigan law to a 6-page letter with footnotes to sources supporting each statement attacking the accuser's credibility, ruling in favor of Cosby]; *Hill v. Cosby* (3d Cir. 2016) 665 Fed.Appx. 169 [applying Pennsylvania law to a brief statement generally challenging the credibility of all of Cosby's accusers, ruling in favor of Cosby]; *Green v. Cosby* (D. Mass. 2015) 138 F.Supp.3d 114 [applying California law to one plaintiff and Florida law to two others; ruling against Cosby on his motion to dismiss].)

To the extent Cosby relies on *McKee* and *Hill* for their conclusion that the statements at issue in those cases consisted of Singer's non-actionable opinion, we are not convinced those cases are germane here. The statements were different and did not contain the repeated language in Singer's statements absolutely and unconditionally claiming Dickinson's rape allegations were false. The federal court opinions did not give sufficient weight to

### 3. *The Press Release Contains Statements of Fact*

We now turn to the press release and consider both its language and its context on the question of provable facts versus nonactionable opinion.

The language of the press release is, again, unconditional. The first line of the press release is "Janice Dickinson's story accusing Bill Cosby of rape is a lie." The statement goes on to reveal three bases for this conclusion – the same three as in the demand letter – that Dickinson told a different story in her book and the *New York Observer* interview, that nobody in the Cosby camp tried to kill the rape story, and that "[Dickinson's] publisher HarperCollins can confirm that no attorney representing Mr. Cosby tried to kill the alleged rape story (since there was no such story) or tried to prevent her from saying whatever she wanted about Bill Cosby in her book."

As with the demand letter, Singer fails to disclose the other facts on which he purportedly relied. As with the demand letter, Singer falsely states that HarperCollins can confirm "there was no [rape] story." As with the demand letter, Singer expressly states that the rape allegations are "a lie." The language of the

the fact that Singer was making the statements as Cosby's agent. When a man is publicly accused of raping a woman and responds with a public statement claiming the accusation itself is false, it is reasonable that a member of the public hearing the statement would *not* think the denial means, "I'm neither affirming nor denying that I raped her, but look at all this evidence challenging her credibility." That the speaker making the denial is himself the accused rapist strongly implies that the denial includes a denial of the rape itself. Here, the speaker was the accused's attorney, speaking with presumed agency. We see no reason the result should be different.

press release is that of actionable fact, not mere opinion based on fully disclosed facts.

The context is similar to that of the demand letter, and again supports the same conclusion. The press release is captioned:

**"STATEMENT OF MARTIN D. SINGER**
**ATTORNEY FOR BILL COSBY**"

It was widely disseminated to the public, and it is reasonable the average person reading it would assume that Singer, as Cosby's attorney, was speaking for Cosby. The statement did not simply state that Dickinson's story was contradicted by her autobiography; it stated that her story "is a lie." The average person would infer that the statement was Cosby's denial of raping Dickinson. Again, the predictable opinion doctrine does not change this result; there is nothing about the fact that Cosby is responding to accusations that would make the reader assume the press release was merely opinion.

> D. The Gist of the Demand Letter and Press Release
> was that Dickinson Lied About Cosby Raping Her

Cosby next argues that Dickinson cannot establish a probability of prevailing on her defamation claim for an additional reason. He argues that the gist or sting of the statements was not that Dickinson lied about the rape allegations, but simply that she was a liar. Armed with this reinterpretation of his defamatory statements, he argues that Dickinson will be unable to recover for defamation because (1) she actually is a liar, having lied about the rape in her autobiography; and (2) she had cultivated the professional reputation of a liar, so she was not harmed by this sting.

50

"The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. [Citations.] It overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.' [Citation.] In this case, of course, the burden is upon petitioner to prove falsity. [Citation.] The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' [Citations.] Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' [Citations.]" (*Masson v. New Yorker Magazine* (1991) 501 U.S. 496, 516-517; see also *Summit Bank v. Rogers, supra,* 206 Cal.App.4th at p. 697.)

Cosby would have us conclude, as a matter of law, that the gist or sting of the demand letter and press release was that Dickinson is a liar, not that Dickinson lied about the rape. This is an inference we cannot make. That Cosby, through Singer, repeatedly characterized Dickinson's rape allegations as fabrication was not a "minor inaccuracy" in the statements; it was the heart of the statements. The statements were made in response to Dickinson's allegations that Cosby had raped her. The statements never said, as a general proposition, that Dickinson was unreliable and untruthful; instead, the statements

51

repeatedly and unconditionally asserted that Dickinson lied about Cosby having raped her.

The standard we apply is whether the allegedly defamatory statement would have a different effect on the mind of the reader from what the *pleaded* truth would have produced. The pleaded truth was that Cosby raped Dickinson; she wanted to tell the truth in her book; but her publisher forced her to replace it with a sanitized version of their encounter. The gist of Cosby's statements, to the contrary, was that he had not raped Dickinson and she told the truth in her book. The pleaded truth and the gist of the statements are incompatible.

That Cosby cannot recast the statements to a simple charge that Dickinson was a liar in general is apparent when we consider the ultimate result Cosby would reach. Cosby argues that calling Dickinson a liar is not actionable because it is substantially true – either Dickinson lied in her autobiography or lied in the *Entertainment Tonight* interview, so she is admittedly a liar. Yet there is no interpretation of Cosby's statements which allows for the possibility that Dickinson lied in her autobiography and was telling the truth now.

To the extent Cosby argues that Dickinson can show no damages because she had already cultivated the professional reputation of a liar, the argument is refuted for now by Dickinson's evidence that she did, in fact, lose jobs as the result of being branded a liar by Cosby on the subject of rape.

E. False Light and Intentional Infliction of Emotional Distress Survive the Anti-SLAPP Motion

As his final argument, Cosby contends that, even if Dickinson's defamation cause of action survives his anti-SLAPP

52

motion, her remaining two causes of action should be dismissed as superfluous.

Depending on the specific allegations in a case, causes of action for false light and intentional infliction of emotional distress may be redundant to a defamation cause of action and subject to dismissal on demurrer for that reason. (*Kapellas v. Kofman* (1969) 1 Cal.3d 20, 35, fn. 16; *Couch v. San Juan Unified School District* (1995) 33 Cal.App.4th 1491, 1504.) While this may be legally correct, an anti-SLAPP motion is not the appropriate time to pursue the argument. "Appellants first argue that this false light claim is 'surplusage' because the complaint also contains a specific cause of action for libel. However, an anti-SLAPP motion is not the correct vehicle for asserting this position. Rather, this argument is properly the subject of a demurrer. [Citation.]" (*Hailstone v. Martinez* (2009) 169 Cal.App.4th 728, 742.) We therefore do not order these causes of action dismissed at this time.

## DISPOSITION

The order granting Singer's motion to dismiss Dickinson's first amended complaint against him is reversed. The order on Cosby's anti-SLAPP motion is affirmed in part and reversed in part. To the extent the anti-SLAPP motion was granted as to the causes of action based on the demand letter, it is reversed; to the extent the anti-SLAPP motion was denied as to the causes of action based on the press release, it is affirmed.

/ / /

/ / /

Dickinson is to recover her costs on appeal from Singer and Cosby.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.