Filed 9/21/21  Marriage of Irvin CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of KAREN IRVIN and MARC IRVIN. | B306295 |
| | (Los Angeles County Super. Ct. No. PD059501) |
| KAREN IRVIN, Respondent, v. MARC IRVIN, Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Helen Zukin, Judge.  Reversed and remanded with directions.

Law Offices of Bruce A. Moss and Bruce A. Moss; Ferguson Case Orr Paterson LLP and Wendy C. Lascher for Appellant.

Law Offices of William W. Oxley and William W. Oxley; Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Respondent.

———————————————

Marc Irvin[1] appeals from an order granting Karen Irvin's special motion to strike (Code Civ. Proc., § 425.16; anti-SLAPP statute)[2] Marc's claim for breach of fiduciary duty asserted against Karen pursuant to Family Code section 1101.[3] Marc asserted that Karen schemed with her mother Mari Jo Carter to impair Marc's interest in a community property commercial building. As alleged, Mari Jo filed a civil lawsuit against Marc and Karen claiming she had loaned them the money to buy the building and demanding repayment with interest. Then, on the eve of trial, Mari Jo dismissed Marc from the lawsuit and immediately entered into a settlement with Karen in which Karen stipulated to a money judgment in favor of Mary Jo that Mari Jo could collect against the community property.

On appeal, Marc contends the family court erred in finding that his claim arose from protected activity within the meaning of Code of Civil Procedure section 425.16, subdivision (e), and that Marc could not establish a probability of prevailing on the merits

---

[1] To avoid confusion, we refer to Marc Irvin and Karen Irvin by their first names. We also refer to Karen's parents Mari Jo Carter and Marvin Carter (now deceased) by their first names.

[2] "'"SLAPP" is an acronym for "strategic lawsuit against public participation."'" (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 786, fn. 1.)

[3] All further undesignated statutory references are to the Family Code.

2

because Karen's conduct involved a privileged communication under Civil Code section 47, subdivision (b). We agree that Karen's alleged breach of her fiduciary duties by settling litigation with her mother in a manner designed to prevent Marc from protecting his community property interests was fundamentally noncommunicative and therefore was not shielded by the litigation privilege. Therefore, even if Marc's claim arose from protected activity, because he met his burden to show probability of prevailing on the merits of his claim, we reverse the family court order granting Karen's special motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Marital Dissolution*

Karen and Marc married in 1989 and separated in late 2014. On February 10, 2015 Karen filed a petition for dissolution of the marriage. In June 2016 a dispute arose between Karen and Marc as to whether $600,000 that Karen's mother Mari Jo and Karen's since-deceased father Marvin had given to Karen and Marc in 2003 to purchase a commercial building located on Centre Pointe Parkway in Santa Clarita (Centre Pointe) was a loan (Karen's position) or a gift (Marc's position). On June 15, 2018 the family court[4] entered a judgment of dissolution and made orders for the division and disposition of the marital property. The court reserved jurisdiction over all issues concerning Centre Pointe pending the outcome of a lawsuit filed by Mari Jo relating to the property. (*Mari Jo Carter v. Marc*

---

[4] Judge Laura A. Seigle presided over the trial and entered the judgment of dissolution and property orders.

3

*Irvin et al.* (Super. Ct. L.A. County, No. BC654402) (the *Carter* action).)

B.    *The* Carter *Action and Stipulated Judgment*

Mari Jo filed the *Carter* action on March 17, 2017, asserting causes of action against Marc and Karen for breach of contract, restitution, common counts for money lent and account stated, specific performance and injunctive relief, as well as a cause of action against Marc for declaratory relief.  Mari Jo alleged that in 2003 she and Marvin loaned Marc and Karen $600,000 to buy Centre Pointe.  The parties reached an oral agreement that Marc and Karen would use the money as a down payment to purchase and build out the property, which would generate income, and Marc and Karen would pay the Carters $2,000 per month beginning in January 2005 as interest-only payments on the loan.  The parties subsequently agreed that if Marc and Karen missed a payment or made a partial payment, the unpaid amount would be added to the principal to be repaid upon a sale or refinancing of Centre Pointe.  From January 2005 through the filing of the lawsuit in 2017, Marc and Karen made $165,500 in interest payments, and they missed $126,500 in payments.

Mari Jo sought damages of $726,500 (the $600,000 loan principal plus the $126,500 in unpaid interest).  She also sought an injunction requiring Marc and Karen to repay the loan with interest "at the time of the closing on the purchase and sale of the Centre Point [p]roperty."

On June 1, 2017 Marc filed a verified answer to Mari Jo's complaint denying her allegation there was an oral agreement and alleging the Carters had gifted him and Karen the $600,000.

4

Marc also asserted 29 affirmative defenses, including the statute of frauds. On September 11, 2017 Karen, representing herself, filed a verified answer admitting the factual allegations of the complaint, including the terms of the alleged oral loan agreement, and admitting Mari Jo was entitled to $726,500.[5] Karen asserted, "Marc Irvin, and only Marc Irvin, failed and refused to do those things alleged [in the complaint]," and Marc's conduct was "wrongful and unlawful" and "will cause unjust enrichment to him at [Mari Jo's] detriment." Karen denied she breached any agreement or Mari Jo was harmed by her conduct. Karen asserted eight affirmative defenses, including the statute of frauds, and sought an offset for any judgment in the marital dissolution action.

Trial was set for Monday, December 10, 2018.[6] On the afternoon of Thursday, December 6, Mari Jo's attorney informed Joseph McGinley, Marc's lawyer in the *Carter* action, that Mari Jo was dismissing Marc from the action and would proceed against Karen only. McGinley gave notice to Karen and to Mari Jo's attorney on Friday morning that Marc would appear ex parte on Monday, December 10 to request to intervene in the *Carter* action. In a declaration supporting the application, McGinley stated, "Throughout this matter, [Karen] has not aggressively or

---

[5] On our own motion we take judicial notice of the following documents filed in the *Carter* action: (1) Karen's answer, filed on September 11, 2017; (2) the trial court's December 10, 2018 minute order denying Marc's ex parte application to intervene and approving the stipulated judgment; and (3) the signed judgment form filed on December 10, 2018. (Evid. Code, §§ 452, subd. (d), 459.)

[6] Judge Terry A. Green presided over the *Carter* action.

otherwise challenged the claims of [Mari Jo] . . . . Instead, [Karen] has fully supported all of the claims of her . . . mother in direct opposition to the interests of [Marc], who is currently a nonparty as a result of his recent dismissal by [Mari Jo]." McGinley argued that Marc's dismissal would result in irreparable harm to Marc because Mari Jo had "dismissed the only defendant who was challenging [her] claims, with the intention of obtaining a large uncontested verdict in her favor that [Karen] and [Mari Jo] will ultimately seek to have enforced against the community assets of [Marc] and [Karen] in the separate family law matter. This will only impose financial harm upon [Marc], as [Mari Jo] will return funds to her daughter . . . so that [Karen] sustains no harm, and so [Karen] can prevent [Marc] from his rightful share of the community property estate."

On Friday, December 7, 2018 Mari Jo lodged a stipulation of judgment signed by Karen and agreeing to entry of a $650,000 judgment in favor of Mari Jo. On Monday, December 10, the trial court (Judge Green) denied Marc's ex parte application to intervene, signed the stipulated judgment, and entered judgment for Mari Jo against Karen for $650,000. McGinley declared that he received no advance notice of Karen and Mari Jo's settlement until he arrived for the hearing on Marc's application.[7]

---

[7] In McGinley's declaration filed in support of Marc's section 1101 request, McGinley stated the trial court "denied our [e]x [p]arte [a]pplication, because the [s]ubject [a]ction was now over." However, the trial court's minute order states the court read and heard argument on the ex parte application; the minute order does not state the grounds on which the court denied the application.

6

C.    *Marc's Section 1101 Request for Order*

On February 15, 2019 Marc filed a request for order in the family court seeking a finding that Karen had breached her fiduciary duty to Marc pursuant to Family Code section 1101, subdivision (a)[8] (the section 1101 claim).  Marc alleged that Karen breached her fiduciary duties to him with respect to their community property by "entering into [a] stipulated judgment with [her] mother on the eve of trial in the civil litigation case when [Marc] was ready, willing and able to litigate trial against [Karen's] mother that resulted in a judgment against [Karen] and that can be enforced by her mother as to community property assets . . . ."  (Capitalization omitted.)  Marc alleged Karen engaged in the following "series of transactions":  "(1) [b]eing aware of the [e]x [p]arte application by [Marc] giving notice to [Karen] to intervene in the civil action after Mari Jo dismissed [Marc]; (2) [e]ntering into a stipulated judgment of $650,000 where Mari Jo was the plaintiff and [Karen] was the defendant; (3) [a]lerting [Marc] that she wants to sell Centre Pointe so that Mari Jo could levy against this community property asset in the amount of $650,000; and [4] causing liability to the community unnecessarily in the amount of $650,000."

In a declaration supporting his section 1101 claim, Marc averred, "But for the stipulated judgment executed by [Karen] that affected the community's interest and created liability to the community by way of a judgment, I would have tried the case and

---

[8]    Section 1101, subdivision (a), provides for a remedy against a spouse who breaches his or her fiduciary duty to the claimant spouse where the breach "results in impairment to the claimant spouse's present undivided one-half interest in the community estate."

7

it would have resulted in a defense verdict with nothing owing to Mari Jo, as opposed to the now owing $650,000. . . . [¶] [Karen] knew that I did not want to settle with Mari Jo and wanted to try the case. . . . [¶] [Karen] obviously wanted to settle with her mother against my wishes. Otherwise, she would have let me know her intentions prior to the time that she entered into the stipulated judgment. Yet, she never contacted me nor McGinley in that regard."[9] Marc declared that after obtaining the stipulated judgment, Karen informed Marc she wanted to proceed with the sale of Centre Pointe. On January 7, 2019, Mari Jo filed an abstract of judgment, which Marc contends was a prelude to collecting $650,000 from the sale of Centre Pointe.[10] Marc opined the existing equity in Centre Pointe was around $650,000; accordingly, Marc requested $650,000 in damages plus attorneys' fees.[11]

---

[9] Marc presented his section 1101 claim as a request for order on the family court's standard form, with an attached memorandum and declaration from Marc. McGinley also submitted a declaration describing the proceedings and attaching deposition transcripts, discovery, and submissions from the *Carter* action. Both Marc's and McGinley's declarations were incorporated into Marc's opposition to Karen's special motion to strike, and we discuss the relevant evidence below.

[10] There is no evidence in the record that Centre Pointe was sold or that Mari Jo collected on the judgment prior to April 3, 2020, when the family court granted Karen's special motion to strike.

[11] Because Marc only seeks 50 percent of the value of the impaired asset, it appears he would only be entitled to approximately $325,000. We not reach the question of the

8

D.    *Karen's Special Motion To Strike*

On March 12, 2019 Karen filed a special motion to strike Marc's section 1101 claim under Code of Civil Procedure section 425.16.  Karen argued Marc's section 1101 claim alleged protected activity under the anti-SLAPP statute because the claim was based on Karen's settlement of the *Carter* action, and "[a]ll of Karen's actions are protected by the litigation privilege and no matter how categorized by Marc, consist of protected activity."

Karen further argued that even if the litigation privilege did not apply, Marc would be unable to demonstrate a probability of prevailing on the merits of his section 1101 claim because the community benefited from her settlement, in that the stipulated judgment ($650,000) was less than the amount Mari Jo was due ($726,500); thus, "Karen and Marc saved $76,500.00 in interest payments."  Karen argued she "acted reasonably and justifiably in settling the suit because Marc's pleadings, discovery responses and the documentary evidence all demonstrate the validity of the debt owed to Karen's mom."  She also asserted Marc's dismissal benefited Marc because his separate property could not be used to satisfy Mari Jo's judgment.

In support of her motion to strike, Karen submitted a declaration and documentary evidence showing the Carters transmitted $600,000 to Karen and Marc in several installments in 2003.  Karen stated that she and Marvin agreed Karen would pay interest on the loan at a 4 percent annual rate beginning in January 2005, and that the principal would be repaid either upon

appropriate amount of Marc's claim for purposes of the special motion to strike.

9

refinancing or sale of the property. Karen averred she and Marc made monthly interest payments of $2,000[12] to Marvin until 2009, when as a result of the economic downturn, Karen and Marvin modified the agreement so that if a payment could not be made or made in full, the missed payment would be added to the principal. As of the date of her declaration, Karen had paid her parents $211,500 on the loan, leaving a balance of missed interest payments of $126,500, which, if added to the principal, "made me indebted to my mother in the amount of $726,500.00." Karen submitted a bill of particulars that Mari Jo had filed in the *Carter* action summarizing the monthly payments made from 2005 to 2017. Mari Jo signed a verification that the listed amounts were true or she believed the amounts to be true. Karen submitted a summary of income and expenses for Centre Pointe showing she wrote periodic $2,000 monthly checks to Mari Jo during 2014 and 2015.[13] Karen stated she received a settlement offer from Mari Jo's attorney on December 5, 2018, and she stipulated to entry of judgment because she believed the settlement was in the best interests of herself, Marc, and the community. Karen believed "my mother was really entitled to the full amount she was seeking," and if the parties had had

---

[12] The $2,000 in monthly interest payments is the amount owed on a $600,000 interest-only loan bearing an annual percentage rate of 4 percent.

[13] Karen stated in her declaration that after the separation, Marc made handwritten notes acknowledging that the $600,000 principal was owed to Mari Jo, and she attached those notes to her declaration. However, the notes are not in the portion of her declaration included in the record on appeal.

proceeded to trial, Mari Jo would have obtained a judgment of $726,500, not $650,000.

In his opposition Marc conceded Karen's family had provided $600,000 toward the purchase of Centre Pointe, but the money was a gift, and his parents also gave the couple money to develop Centre Pointe. Karen did not present any evidence in the *Carter* action showing the existence of a written loan agreement or the terms alleged by Mari Jo, and Marc testified in his deposition that the payments Karen made to her parents over the years were "sporadic" and intended to provide Mari Jo with spending cash roughly commensurate with the net income generated by Centre Pointe. Karen never discussed with Marc the idea that the payments equaled 4 percent annual interest on the loan principal, and Karen told Marc at one point that her parents were doing fine and did not need extra money. In addition, Marc and Karen applied to refinance their mortgage on Centre Pointe in 2009, and although Karen was a licensed real estate broker, she did not disclose on the application a loan from the Carters on the property.

McGinley stated in his declaration that when the loan application was shown at Marc's deposition in the *Carter* action, Karen blurted out, "well, we wouldn't have gotten the loan," and she told McGinley there was no need to include the loan in the refinancing application because it was not listed on the original loan application. Marc submitted excerpts from Karen's deposition in which she inconsistently testified that she told the loan officer about the loan, but the loan officer filled out the application and she presumed "they didn't care" about the family loan because "[t]hey asked me questions and they said that they weren't going to include it for the same reason [the original

11

lender] didn't include it, and it seemed reasonable to me to leave it off. . . . [¶] Since we weren't making payments at that time and there was no definitive maturity date." McGinley declared that Marc was prepared to prove in the *Carter* trial that after the separation, Mari Jo repaid Karen amounts roughly equivalent to the interest payments Karen had made to her, and he attached bank records showing Mari Jo had on multiple occasions endorsed over to Karen the putative interest payment checks from Karen and Marc's operating account, which Karen then deposited into her personal account.

After several rounds of additional briefing and a hearing, the family court[14] on November 15, 2019 issued a detailed order denying Karen's special motion to strike. The court concluded Karen's alleged conduct did "not fall within the ambit of [Code of Civil Procedure] § 425.16 or Civ. Code § 47(b) protected activity." The court reasoned, "the essence of [Karen's] alleged activity is that of colluding with her mother to transfer $650,000 from community assets, controlled by [Karen], to her mother in a secret agreement without informing [Marc]," and "the alleged conduct could have occurred without the existence of litigation." The court further found Marc had made a "minimal showing of likelihood of success" on his claim because "a reasonable trier of fact could conclude that [Karen] intentionally breached her fiduciary duty under Family Code [section] 1011 by colluding with her mother to settle her mother's claim causing a detriment to the community property assets of $650,000 of which [Marc] had a one half interest."

---

[14] Judge Helen Zukin presided over the family court proceedings on Marc's section 1101 claim and Karen's special motion to strike.

Karen filed a motion for reconsideration, asserting the court erred in finding that the anti-SLAPP statute did not apply to Marc's section 1101 claim; her conduct was protected by the litigation privilege; and the court's factual findings concerning Karen's payments were contrary to the family court's approval of Karen's accounting in which she characterized the payments as interest. The family court denied Karen's motion on the grounds she failed to set forth new law, facts, or circumstances, but on its own motion and "upon further reflection," the court reconsidered its prior order.

In a 13-page tentative decision, which the family court adopted as its final order on April 3, 2020, the court held that Code of Civil Procedure section 425.16 applied to Marc's section 1101 claim because his allegations involved Karen's activity "in pleadings, statements and writings 'in connection with' litigation," and Marc did not show that Karen's conduct was illegal. Considering the merits of Marc's claim, the court again concluded Marc presented prima facie evidence that Karen breached her fiduciary duty to him by colluding with Mari Jo to settle the *Carter* action to cause detriment to community property. Nonetheless, the court found Marc did not have a reasonable chance of prevailing on the section 1101 claim because Karen's alleged conduct "falls squarely within the litigation privilege" because her "settlement communications and the signing of the settlement agreement were made in a judicial proceeding in which she was a litigant [and] [h]er conduct was intended to achieve the objective of resolving the Centre Pointe property dispute with her mother . . . ." Absent evidence of illegal conduct, the court found the litigation privilege applied regardless of collusion. Concluding the anti-SLAPP statute

13

applied and the litigation privilege immunized Karen's conduct, the court granted Karen's special motion to strike.

Marc timely appealed.

## DISCUSSION

A.    *Special Motions To Strike*

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (Code Civ. Proc., § 425.16, subd. (b)(1); see *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*).)  An "'act in furtherance of the person's right of petition or free speech'" includes, in relevant part, "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" (Code Civ. Proc., § 425.16, subd. (e)(1)) and "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (*id.*, subd. (e)(2)).  (See *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 (*Rusheen*) ["'Any act' includes communicative conduct such as the filing, funding, and prosecution of a civil action."].)

"Courts 'have adopted a fairly expansive view of what constitutes litigation-related activities within the scope of [Code of Civil Procedure] section 425.16.'"  (*O&C Creditors Group, LLC*

14

*v. Stephens & Stephens XII, LLC* (2019) 42 Cal.App.5th 546, 566 (*O&C Creditors*).) "A settlement agreement executed in the context of active litigation is 'made in connection with an issue under consideration or review by a . . . judicial body.'" (*Ibid.*; accord, *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 963 ["[S]ettlement negotiations are an exercise of the right to petition and statements made as part of such negotiations are in connection with the underlying lawsuit for purposes of section 425.16, subdivision (e)(2)."]; see *Navellier v. Sletten* (2002) 29 Cal.4th 82, 90 [negotiation and execution of a litigation release involved activities within Code Civ. Proc., § 425.16, subd. (e)(2)].)

Analysis of a special motion to strike involves a two-step process. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*); accord, *Wilson, supra*, 7 Cal.5th at p. 884.) "First, the defendant must establish that the challenged claim arises from activity protected by [Code of Civil Procedure] section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385 (*Baral*); accord, *Bonni*, at p. 1009.) "'"Only a cause of action that satisfies both prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute."'" (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321; accord, *Towner v. County of Ventura* (2021) 63 Cal.App.5th 761, 769.) Thus, reviewing courts have occasionally bypassed the first-prong analysis where the plaintiff has satisfied its burden on the second prong. (See, e.g., *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 ["[W]e will proceed in these particular circumstances directly to the second prong, inasmuch as we have readily found that [plaintiff]

15

has demonstrated a probability of prevailing on its claims."]; *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988-989 ["We . . . determine only step two: whether plaintiff met the burden imposed on him. And easily conclude that he did."].)

As to the first step of the analysis, "[a] claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*); accord*, City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) "The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 92; accord, *Baral, supra*, 1 Cal.5th at p. 393; see *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 671 ["Because conduct that is alleged to be a breach of duty . . . may also fall within the class of constitutionally protected speech or petitioning activity, a court considering a special motion to strike must examine the allegedly wrongful conduct itself, without particular heed to the form of action within which it has been framed."].) "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park*, at p. 1063; accord, *Bonni, supra*, 11 Cal.5th at p. 1009.) "The defendant's burden is to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Bonni*, at p. 1009.)

16

"[A] claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park, supra*, 2 Cal.5th at p. 1060; accord, *Wilson, supra*, 7 Cal.5th at p. 884.) "Assertions that are 'merely incidental' or 'collateral' are not subject to [Code of Civil Procedure] section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra*, 1 Cal.5th at p. 394; see *Aguilar v. Goldstein* (2012) 207 Cal.App.4th 1152, 1160 ['"If the mention of protected activity is "only incidental to a cause of action based essentially on nonprotected activity," then the anti-SLAPP statute does not apply.'"].)

"As to the second step, a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*); Code Civ. Proc., § 425.16, subd. (b)(2) ["In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."].) "'We have described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and

17

made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.'" (*Monster Energy*, at p. 788.) Similarly, "[w]hen evaluating an affirmative defense in connection with the second prong of the analysis of an anti-SLAPP motion, the court, following the summary-judgment-like rubric, generally should consider whether the defendant's evidence in support of an affirmative defense is sufficient, and if so, whether the plaintiff has introduced contrary evidence, which, if accepted, would negate the defense."[15] (*Bentley Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 434.)

---

[15] As the Court of Appeal in *Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 683 observed, appellate courts have reached different conclusions as to which party bears the burden of proof of an affirmative defense in the anti-SLAPP context. In *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, supra*, 133 Cal.App.4th at page 676, the court held that "although [Code of Civil Procedure] section 425.16 places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense." However, in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1485, the court characterized the litigation privilege under Civil Code section 47, subdivision (b) as "'a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing.'" We do not reach this issue here, as the applicability of the litigation privilege turns on undisputed facts demonstrated in both parties' submissions. (See *Dickinson*, at p. 683 ["What is important is that, regardless of the burden of proof, the court must determine whether plaintiff can establish a prima facie case of prevailing, or whether defendant has defeated plaintiff's evidence as a matter of law."].)

18

We review de novo the grant or denial of a special motion to strike, "evaluating the context and content of the asserted activity." (*Wilson, supra,* 7 Cal.5th at pp. 884-885; accord, *Park, supra*, 2 Cal.5th at p. 1067.) "We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. [Citations.] In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based." (*Park*, at p. 1067.)

B.  *We Do Not Reach Whether Marc's Section 1101 Claim Arises from Protected Activity*

Section 721, subdivision (b), provides in relevant part that "spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other." Section 1100 provides further that "[e]ach spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in [s]ection 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have

19

an interest and debts for which the community is or may be liable . . . ." (§ 1100, subd. (e).)

Section 1101, subdivision (a), establishes a claim for damages for breach of a spouse's fiduciary duty: "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate." Section 1101, subdivisions (g) and (h), provide as remedies that the claimant spouse may recover 50 percent of the undisclosed or transferred asset, or 100 percent of the asset in cases of malice, oppression, or fraud.

Marc's section 1101 claim alleges Karen caused the community to be liable for $650,000 by entering into the stipulated judgment with Mari Jo on the eve of trial after Marc gave notice he intended to move ex parte to intervene back into the *Carter* action, even though Marc was ready to defend against Mari Jo's claims. Karen's alleged intent in settling the lawsuit in this manner was to secure a claim to the equity in Centre Pointe, but it was Karen's settlement-related conduct that constituted the primary vehicle by which she achieved this result. Thus, arguably, Karen's settlement-related "activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park, supra*, 2 Cal.5th at p. 1060; accord, *Wilson, supra*, 7 Cal.5th at p. 884.) Further, it is well-settled that negotiation and execution of a settlement agreement are petitioning activities under Code of

Civil Procedure section 425.16.  (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 90 [fraud claims based on defendant's negotiation and execution of release fell within scope of anti-SLAPP statute]; *O&C Creditors, supra*, 42 Cal.App.5th at p. 566 ["A settlement agreement executed in the context of active litigation is 'made in connection with an issue under consideration or review by a . . . judicial body.'"]; *Seltzer v. Barnes, supra*, 182 Cal.App.4th at p. 963 [settlement negotiations fall within scope of anti-SLAPP statute].)

Marc responds that his claim is based on Karen's "concocting and carrying out a scheme" to deprive Marc of his community interest in Centre Pointe, a scheme that could have been consummated by other means.  Relying on the Supreme Court's decision in *Park, supra*, 2 Cal.5th 1057, Marc implicitly argues Karen's settlement-related conduct is not the violation at the heart of his section 1101 claim, but instead "evidence of liability or a step leading to some different act for which liability is asserted."  (*Park, supra*, 2 Cal.5th at p. 1060.)  In *Park*, the Supreme Court held that a university professor's claim under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) alleging the university denied him tenure on the basis of his national origin did not arise from the university's protected communications leading up to and following the tenure decision.  (*Park,* at p. 1061.)  The court concluded the elements of the professor's discrimination claim "depend not on the grievance proceeding, any statements, or any specific evaluations of him in the tenure process, but only on the denial of tenure itself and whether the motive for that action was impermissible.  The tenure decision may have been communicated orally or in writing, but that communication does not convert [professor's]

21

suit to one arising from such speech. . . . Plaintiff could have omitted allegations regarding communicative acts or filing a grievance and still state the same claims.'" (*Id.* at p. 1068.) Unlike in *Park*, however, it is not clear how Marc could have stated a section 1101 claim without alleging the basis for his claim—that Karen entered the collusive settlement without Marc's knowledge or consent.

We need not decide if Marc's claim arises from protected activity because ""'[o]nly a cause of action that satisfies both prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute.'"" (*Barry v. State Bar of California, supra,* 2 Cal.5th at p. 321; see *Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th at p. 820.) As discussed below, Marc has demonstrated a probability of succeeding on the merits of his section 1101 claim, and accordingly, the family court erred in sustaining Karen's special motion to strike.

C. *Marc Demonstrated a Probability of Success on the Merits of His Claim*

1. *Marc made a prima facie showing Karen breached her fiduciary duties under the Family Code*

Assuming Marc's section 1101 claim arose from Karen's protected activity, Marc bore the burden to make "a prima facie factual showing sufficient to sustain a favorable judgment" on his claim to defeat Karen's special motion to strike. (*Monster Energy, supra,* 7 Cal.5th at p. 788.) Although the family court ultimately granted Karen's motion to strike on the basis of the litigation privilege, it found that "given the evidence submitted herein, a reasonable trier of fact could conclude that [Karen] intentionally breached her fiduciary duty under Family Code [section] 1101 by

22

colluding with her mother to settle her mother's claim causing a detriment to the community property assets . . . ." We agree Marc made a prima facie showing of Karen's breach of her fiduciary duty.

From the outset of the *Carter* action, Karen did not challenge Mari Jo's claims. In her verified answer, Karen admitted she and Marc had an oral interest-bearing loan agreement with her parents on the precise terms alleged by Mari Jo and that Marc breached the agreement by rebuffing Mari Jo's demand for repayment of the $600,000 principal and $126,500 in interest. Marc actively defended the case from the filing of his answer to the eve of trial, asserting that Karen's parents provided a gift of $600,000 to Karen and Marc for the purchase of Centre Pointe. As Marc and McGinley stated in their declarations, Marc was ready for trial and did not want to settle with Mari Jo for nearly 90 cents on the dollar. Yet Mari Jo dismissed Marc on the Thursday afternoon before the Monday trial date, and shortly after McGinley gave notice on Friday morning of his intent to seek an ex parte order the following Monday allowing Marc to intervene back into the *Carter* action, Karen and Mari Jo executed and filed the stipulated judgment for nearly the full amount of Mari Jo's claim.[16] Marc declared Karen

---

[16] Marc's dismissal from the *Carter* action also prevented him from appealing from the judgment. (See *BRE DDR BR Whittwood CA LLC v. Farmers & Merchants Bank of Long Beach* (2017) 14 Cal.App.5th 992, 998, fn. 3 ["Only a party aggrieved by the judgment has standing to appeal."]; Code Civ. Proc., § 902 ["Any party aggrieved may appeal in the cases prescribed in this title."]; see also *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736 ["one who is denied the right to intervene in an action ordinarily may not appeal from a judgment subsequently entered

announced her desire to proceed with the sale of Centre Pointe upon the conclusion of the *Carter* action, and Mari Jo recorded an abstract of judgment, supporting Marc's assertion Mari Jo intended to collect the judgment by levying against the proceeds from the sale. Marc also produced copies of cashed checks written after the couple's separation that purportedly were to pay Mari Jo interest but were endorsed to Karen and deposited in her bank account.

In support of her special motion to strike, Karen declared that she and Marvin agreed the $600,000 amount was an interest-bearing loan, and she submitted evidence of payments, albeit sporadic and variable, to Mari Jo and Marvin. But as discussed, we do not weigh evidence or resolve conflicting factual claims in deciding whether a plaintiff has made a prima facie claim as part of the second step of the anti-SLAPP analysis. (*Monster Energy, supra*, 7 Cal.5th at p. 788.) And regardless of whether Marc had a successful defense of the *Carter* action, Marc made a showing that Karen engaged in conduct inconsistent with the "duty of the highest good faith and fair dealing on each spouse [that] neither shall take any unfair advantage of the other" (§ 721, subd. (b)), and further, that "in the management and control of the community assets and liabilities" Karen failed to "make full disclosure . . . of all material facts and information regarding the existence, characterization, and valuation of all

---

in the case"].) However, Marc could have appealed from the order denying his request to intervene, and he could alternatively have "'become a party of record and obtain a right to appeal by moving to vacate the judgment or order pursuant to section 663.'" (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295; *County of Alameda*, at p. 736.)

[community assets] . . . and debts for which the community is or may be liable." (§ 1100, subd. (e)).  In short, Marc demonstrated sufficient merit to his claim through competent, admissible evidence to survive a special motion to strike.  (*Monster Energy*, at p. 788.)

> 2.    *The litigation privilege does not bar Marc's section 1101 claim*

Marc contends the family court erred in finding the litigation privilege applied to his section 1101 claim, arguing Karen's alleged conduct was not communicative, and the litigation privilege "does not exempt a spouse from the consequences of a breach of fiduciary duty."  He also argues that "[a]pplying the litigation privilege to Karen's scheme to misappropriate the Centre Pointe property would make Family Code sections 721 and [1101] meaningless."  We agree that under the circumstances here, Karen's breaches of fiduciary duty were substantially noncommunicative and thus not shielded by the litigation privilege.

Civil Code section 47 provides in relevant part, "A privileged publication or broadcast is one made:  [¶]  . . .  [¶] (b) [i]n any . . . judicial proceeding, [or] . . . in any other official proceeding authorized by law. . . ."  (Civ. Code, § 47, subd. (b).)  "'The principal purpose of [the litigation privilege] is to afford litigants . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative actions.'"  (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241; accord, *Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1006.)  The privilege "'applies to any communication (1)

made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" (*Rusheen, supra*, 37 Cal.4th at p. 1057; accord, *Trinity Risk Management*, at pp. 1006-1007.)  The privilege is "not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." (*Rusheen*, at p. 1057; *Trinity Risk Management*, at p. 1007.)  The privilege has "an expansive reach," and the only exception in tort law is a claim for malicious prosecution.  (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194.)  The privilege exists "'not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with [subsequent derivative] actions.' [Citation.]  . . .  Thus, the 'salutary policy reasons for an absolute [litigation] privilege supersede individual litigants' interests in recovering damages for injurious publications made during the course of judicial proceedings.'" (*Rusheen*, at p. 1064.)

However, "[b]ecause the litigation privilege protects only publications and communications, a 'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct was communicative or noncommunicative. [Citation.]  The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. [Citations.]  That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Rusheen, supra*, 37 Cal.4th at p. 1058; accord, *Aghaian v. Minassian* (2020) 59 Cal.App.5th 447, 457 (*Aghaian*).)  "The '[p]leadings and process in a case are generally viewed as privileged

26

communications.'" (*Rusheen*, at p. 1058 [litigation privilege applies to abuse of process claim alleging filing of perjurious testimony or declarations]; accord, *Chen v. Berenjian* (2019) 33 Cal.App.5th 811, 820-821 (*Chen*) [acts of filing sham complaint and agreeing to stipulated judgment were communicative, but gravamen of fraudulent transfer claim effectuated through the sham settlement was not].)

The central allegation of Marc's section 1101 claim is that Karen subjected the community estate to a $650,000 judgment in favor of Mari Jo by secretly executing a settlement with Mari Jo before Marc could request to intervene back into the *Carter* action to defend the case. Had Marc instead alleged Karen entered a settlement that impaired community property based on her bona fide but incorrect belief the case was indefensible, his claim would arise solely from a communicative act—Karen's entry into a settlement agreement. But this is not the gravamen of Marc's claim. Rather, as Marc argued in the family court, his claim was based on Karen's use of the *Carter* litigation as a vehicle to impair Marc's community property interest in Centre Pointe by having Marc dismissed from the action knowing he intended to defend the case at trial, then entering into an eleventh-hour settlement and stipulated judgment that gave Mari Jo a judgment enforceable against Centre Pointe for essentially all its value, in a manner calculated to deny Marc of a meaningful opportunity to protect his interest. (See § 721, subd. (b) [Karen owed fiduciary duty to Marc as her spouse "of the highest good faith and fair dealing"], § 1100, subd. (e) [Karen owed Marc with respect to "management and control of the community assets" a duty "to make full disclosure . . . of all material facts and information" regarding community assets and liabilities].) Thus,

27

the gravamen of Marc's claim was Karen's noncommunicative conduct in coordinating with Mari Jo, a nominally adverse party, to impair Marc's community property interest, even though part of the scheme involved entry of the settlement, a communicative act.

Marc relies on the Court of Appeal decisions in *Chen, supra*, 33 Cal.App.5th at page 815 and *Aghaian, supra*, 59 Cal.App.5th at page 458, in which the courts concluded the litigation privilege does not immunize schemes that use a litigation settlement to effectuate asset transfers in violation of the Uniform Voidable Transactions Act (Civ. Code, § 3439 et seq.; UVTA). In *Chen*, a judgment creditor who had obtained judgments for more than $90,000 in undelivered electronics filed a claim under the UVTA against the judgment debtor and the debtor's brother alleging the debtor and his brother agreed the brother would file a lawsuit against the debtor, obtain a default judgment, and enter a lien against the debtor's assets. (*Chen*, at p. 815.) The brother filed the lawsuit based on false allegations and entered a stipulated judgment with the debtor for approximately $200,000; the brother later levied on two stereo speakers held by the debtor, and the debtor transferred other assets to his brother, all to defeat the creditor's claims. (*Id.* at pp. 815-816.) The Court of Appeal concluded the litigation privilege did not protect the conduct of the debtor and his brother because "the acts causing injury to [the creditor] were the agreement to defraud him and the transfer of the [property] from [the creditor to his brother] by means of executing on [the brother's] judgment." (*Id.* at p. 821.) Further, "[t]he acts of filing the sham complaint and agreeing to the stipulated judgment, though communicative in nature, were not the gravamen of [the

28

creditor's] fraudulent transfer cause of action. . . . [The brother's] levy was the allegedly voidable transfer producing the injury and was, therefore, the gravamen of the cause of action for fraudulent conveyance." (*Ibid.*)

In *Aghaian, supra*, 59 Cal.App.5th at page 452, the plaintiffs filed claims under the UVTA alleging that the defendant Shahen and his wife of over 50 years, with the assistance of their son, "'concocted' a 'scheme . . . to hinder, delay or defraud Shahen's creditors, particularly [p]laintiffs, by putting [Shahen and his wife's] two houses . . . into [the wife's] name only, and thereby making it more difficult for [p]laintiffs to levy on them.'" To accomplish this scheme, Shahen and his wife filed a fraudulent petition for marital dissolution (they never separated), and with their son acting as Shahen's guardian ad litem, stipulated to a judgment in the dissolution action allocating ownership of the houses to the wife and any obligation to pay a judgment in plaintiffs' pending lawsuit to Shahen. (*Id.* at pp. 452-453.) The Court of Appeal concluded that the gravamen of plaintiffs' allegations was that Shahen and his wife, with their son's aid, "used the dissolution judgment to authorize and justify Shahen's transfer of the . . . properties to [his wife]. As in *Chen*, it is the transfer of the property, not the sham judicial proceedings used to provide legal cover for the transfer, that constitutes the gravamen of the action." (*Aghaian*, at p. 458.) So too in this case, the gravamen of Marc's section 1101 claim is that Karen's settlement with Mari Jo was a sham vehicle designed to impair Marc's community property interest in Centre Pointe.[17]

---

[17]     We recognize there is some tension between our holding as to the second prong that the gravamen of Marc's claim is

Karen contends the facts of this case are more akin to those of *Rusheen, supra,* 37 Cal.4th 1048, than *Chen* or *Aghaian.* In *Rusheen*, the defendant alleged in a cross-complaint against the plaintiff's attorney that the attorney committed an abuse of process by filing false declarations of service to obtain and execute on a default judgment against the defendant. (*Id.* at pp. 1053-1054.) The trial court granted the attorney's special motion to strike, which the Court of Appeal reversed. (*Id.* at pp. 1054-1055.) The Supreme Court held the Court of Appeal erred in concluding as to the second prong of the anti-SLAPP analysis that the litigation privilege did not apply, explaining, "[S]ince a party may not be liable for submitting false testimony or evidence in the course of judicial proceedings which are used to obtain a judgment, the party should likewise be immune from abuse of process claims for subsequent acts necessary to enforce it. . . . Thus, where the gravamen of the complaint is a privileged communication (i.e., allegedly perjured declarations of service) the privilege extends to necessarily related noncommunicative acts (i.e., act of levying)." (*Id.* at p. 1062)

---

noncommunicative conduct by Karen, and Karen's argument as to the first prong that Marc's claim arises from her settlement-related conduct. But as the Supreme Court held in *Flatley v. Mauro* (2006) 39 Cal.4th 299, 322, "the litigation privilege and the anti-SLAPP statute are substantively different statutes that serve quite different purposes." As *Flatley* explained, "The former enshrines a substantive rule of law that grants absolute immunity from tort liability for communications made in relation to judicial proceedings [citation]; the latter is a procedural device for screening out meritless claims." (*Id.* at p. 324.)

*Rusheen* is distinguishable. There, the Court of Appeal concluded the gravamen of the cross-complaint was a conspiracy to enforce the judgment (a noncommunicative act) that had been obtained by use of perjured declarations of service. (*Rusheen, supra*, 37 Cal.4th at pp. 1061-1062.) But the operative cross-complaint had abandoned a conspiracy claim, leaving only the filing of the perjured declarations of service as the allegedly wrongful conduct. (*Id.* at p. 1062.) Thus, as the Supreme Court concluded, the gravamen of the action was the procurement of the judgment based on the perjured declarations, a communicative act, with the levying on the judgment being a "necessarily related noncommunicative act[]." (*Ibid.*) By contrast, like the transfers in *Aghaian* and *Chen*, Marc's claims were based on Karen's scheme to expropriate Marc's community interest in Centre Pointe, a noncommunicative act, although the vehicle used to achieve the transfer of Marc's interest was communicative (the eleventh-hour collusive settlement). As the Court of Appeal explained in *Chen*, "Levying on property as part of a scheme to defeat a creditor's rights in violation of the UVTA is not communicative conduct; therefore, extending the litigation privilege to such conduct advances none of the privilege's purposes." (*Chen, supra*, 33 Cal.App.5th at p. 822.) Section 1101, like the UVTA, focuses on a spouse's conduct to deprive the other spouse of his or her share in community property, regardless of the means employed to achieve it. (See §1101, subd. (a) [authorizing a "claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's . . . interest in the community estate"].) Thus, Marc stated a prima facie claim under section 1101, regardless of the particular means Karen employed to impair Marc's interest.

31

## DISPOSITION

The family court order granting Karen's special motion to strike is reversed.  The cause is remanded to the family court with directions to enter an order denying the motion.  Marc is to recover his costs on appeal.

FEUER, J.

We concur:


SEGAL, J., Acting P.J.


IBARRA, J.*

---

\*       Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.