Filed 9/21/22  Scott v. Sado CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ZELIA SCOTT, | B313037 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV31941) |
| v. | |
| PAUL SADO, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Patricia Nieto, Judge.  Affirmed.

L.A. Superlawyers and William W. Bloch for Plaintiff and Appellant.

Enenstein Pham & Glass and Teri T. Pham for Defendant and Respondent.

———————————————

Aspiring actress Zelia Scott contends that she was sexually assaulted by producer Paul Sado, an assertion Sado denies. Before any litigation was filed, Scott self-published an account of the assault on a public website. Thereafter, Scott sued Sado for assault, and Sado sued Scott for defamation. After the actions were consolidated, Scott filed a motion to strike Sado's defamation complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16). She argued: (1) that her article was speech on an issue of public interest; and (2) Sado had no probability of prevailing because her article was protected by the absolute litigation privilege of Civil Code section 47, subdivision (b), as a communication related to the assault litigation she had planned to file. The trial court denied the motion, agreeing that the article constituted speech on an issue of public interest, but disagreeing that the absolute litigation privilege applied. Scott appeals, arguing only that her article is protected by the absolute litigation privilege. We conclude that the court did not err. Scott's article was directed to the general public and not limited to individuals with a substantial interest in the outcome of her contemplated assault litigation, which took it outside the scope of the privilege. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. ***The Disputed Attack***

This much is undisputed. Scott and Sado met in May 2018 and had a brief relationship involving consensual sexual activity. In the early hours of July 16, 2018, Scott was at Sado's home and the two were "making out." Here, the parties' accounts diverge. Scott claims that Sado violently grabbed her neck and began to strangle her; she nearly lost consciousness; and by the time he finally released her, her neck and chest were red and swollen, her

2

tooth was chipped, and she had suffered trauma to her larynx and temporomandibular joint. Sado claims the encounter was entirely consensual and Scott simply pulled away, cursing at him, and would not explain why she left.[1]

Scott made a police report, and told the detective that she wanted Sado prosecuted. The detective told Scott that she would speak to the District Attorney, but no charges were filed.

## 2. *Scott's Allegedly Defamatory Article*

On July 16, 2019, exactly one year after the alleged attack, Scott wrote an article on the website, Medium, entitled "Paul Sado Assaulted Me." The Medium website is available for the public to read for free.

Scott's article is lengthy. It recounts, in detail, Scott's version of meeting Sado, the assault, and its aftermath. She explained the physical problems and depression which continued after the alleged attack. She complained about the District Attorney's inaction.[2] She claimed, at length, that Sado continued to post on his own social media accounts comments purporting to support the "Me Too" movement and women who have been assaulted by sexual predators. Scott wrote, "All of it is a facade. As if by virtue signaling loudly enough, no one will hear the sobbing and pleading of his victims."

Her article ended with the following paragraphs: "I've obviously been very reticent to share my story. Who wants to be

---

[1] We express no opinion on the merits of Scott's claim.

[2] Scott wrote, "It is infuriating to know that you can do everything right, and yet pieces of shit like Paul will likely walk away with not even a slap on the wrist, thanks to prosecutors who are more concerned with *appearing* to have high conviction rates than actually putting in the work to fight for justice."

known for something like this?  [¶]  But I'm telling my story because I know the kind ER nurses and police officers were right when they said I should come forward because '*If he's done this to you, he's likely done it before, and will likely do it to others*.'  I want people to know not only about Paul, but to watch out for people like Paul, who try to paint themselves as champions for noble causes, when in reality, they are just as bad as those that they're decrying.  [¶]  **Paul Sado assaulted, strangled and nearly killed me, and I want everyone to know.**  [¶]  I don't care if that means I never work in this town again.  This is what happened and people need to know that it's not just the 'big shots' that do this type of thing and get away with it.  It's also the coat tail riding 'nobodies' who do it too."  (Emphasis original.)

Scott then shared the article on her own social media (Twitter, Instagram, and Facebook) accounts.  When she shared the article on Facebook, she added, "Since sharing my story on twitter about being assaulted by Paul Sado, I've had a few people reach out and tell me there are other women who have had bad experiences with him.  If you know Paul, or have worked with him, or might know a woman who needs to see this, please share.  I don't want him to hurt anyone else, and if there are other victims, I hope they feel empowered to share their story.  I almost didn't survive to share mine.  #metoo #paulsado #hollywood"  While Scott's Facebook post asked for other victims to step forward, her original Medium article did not.

4

### 3. *The Cross-Actions*

On September 6, 2019, nearly two months after publishing her article, Scott filed suit against Sado.[3] She alleged causes of action for intentional infliction of emotional distress, assault, battery, sexual battery, violation of the Ralph Civil Rights Act (Civ. Code, § 51.7), and gender violence (Civ. Code, § 52.4).

More than a year later, on September 29, 2020, Sado filed his suit against Scott, alleging a single cause of action for defamation per se. Sado charged as defamatory both the Medium article and Scott's republications of it on social media.[4]

By stipulation, the two cases were consolidated.

### 4. *Scott's Anti-SLAPP Motion*

"An anti-SLAPP motion presents a means by which a defendant, sued for conduct in furtherance of the constitutional right of petition or free speech, can place the burden on a plaintiff to establish that there is a probability of prevailing on the claim

---

[3] In the trial court's tentative, which ultimately became its ruling, the court stated Scott's article was published "months prior" to the litigation. Scott challenged this characterization at the hearing, claiming the time period was only "seven weeks." The distinction is immaterial; the court was merely rounding.

[4] Sado also alleged, on information and belief, that Scott had forwarded the article "and other false statements" in emails to "various contacts and business affiliates" of Sado. Sado offered as evidence an email apparently sent pseudonymously to someone at a talent agency, claiming that Sado "violently strangled a Hollywood actress" on July 16, 2018. In connection with her anti-SLAPP motion, Scott successfully objected to the evidence of this e-mail. Sado does not challenge the evidentiary ruling. We do not consider the e-mail on the merits of the appeal, and mention it only to further explain the allegations of Sado's complaint.

or face early dismissal of the action.  (Code Civ. Proc., § 425.16, subd. (b)(1).)  If the defendant first establishes a prima facie showing that a claim is based on so-called 'protected activity,' the burden switches to the plaintiff to establish the lawsuit has at least minimal merit.  [Citation.]" (*Ratcliff v. Roman Catholic Archbishop of Los Angeles* (2022) 79 Cal.App.5th 982, 997.)

The anti-SLAPP statute itemizes four types of protected activity:  "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (Code Civ. Proc., § 425.16, subd. (e).)

Scott argued that she satisfied her burden to show that Sado's defamation complaint arose from activity protected by the anti-SLAPP statute in two ways.  First, she claimed her article was prelitigation conduct in anticipation of litigation, protected under subdivisions (e)(1) and (e)(2).  Second, she claimed it was speech on a public forum in connection with an issue of public interest, protected under (e)(3).  The trial court would ultimately agree with her on the latter argument.  Although Sado challenges this determination in his respondent's brief, we conclude it is unnecessary to consider it.  We therefore assume, without deciding, that Scott satisfied her burden to establish the

6

defamation cause of action arose from protected speech on a public forum in connection with an issue of public interest.[5]

Once a movant on an anti-SLAPP motion establishes the action arises from protected speech, the burden shifts to the plaintiff to demonstrate the merits of the claim by establishing a probability of success. (*Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 666.) Here, Scott sought to argue that Sado could not establish a probability of success, because her statements about him were protected by the absolute litigation privilege of Civil Code section 47, subdivision (b).[6]

---

[5] On July 29, 2021, our Supreme Court issued *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995. In *Bonni*, the court held that "[a]nalysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief – each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action – to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]" (*Id.* at p. 1010.) Although the *Bonni* opinion predates Scott's October 28, 2021 opening brief by several months, Scott makes no attempt to argue each individual publication (Medium, Facebook, Twitter) should be treated separately. To the contrary, she suggests that if the Facebook post alone is protected, the entire complaint should be stricken. That argument is precluded by *Bonni*.

[6] She also argued that the statements were protected by the common interest privilege. Although Scott mentions the common interest privilege in passing in her briefing on appeal, her arguments are limited to the litigation privilege.

7

As the allegedly defamatory statements published in Scott's Medium article predated her complaint against Sado, Scott argued that they were protected by the litigation privilege as pre-litigation conduct.  She submitted a declaration explaining that she wrote the Medium article for a number of reasons – some of which were litigation-related.  Specifically, she declared that she wrote the article because:  (1) she wanted to make her "voice heard"; (2) she wanted to alert others about Sado, but also to be wary of other "predators in the entertainment industry," who claim to be champions of women but in reality "are monsters and threats to women at large"; (3) she hoped that "other victims would come forward and provide witness testimony to Sado's past assaults," which would make "the complaint [she] planned to file against Sado . . . that much stronger"; and (4) she thought that by going public, it would encourage the District Attorney to fully investigate her complaint and eventually charge Sado.  Scott explained that she chose Medium in particular because it would "maximize the chance that my article would reach the target audience, both who I wanted to warn and whom I hoped would be witnesses against him."

## 5.    *Sado's Opposition*

As we have discussed, we are limiting our discussion to the second prong of the anti-SLAPP analysis:  whether Sado established a probability of success on his defamation cause of action.  On that point, Sado submitted his own declaration, stating that Scott's Medium article is "entirely untrue.  I did not assault, strangle or choke Ms. Scott."

He argued that the litigation privilege does not apply, because the privilege does not extend to publications to non-

8

participants in an action and particularly does not protect litigating a case in the press.

6. *Ruling and Appeal*

After a hearing, the trial court denied the anti-SLAPP motion. As to the second prong analysis, the court concluded that Sado's declaration was sufficient to establish a probability of prevailing. "Accepting Sado's version of the events on July 16, 2018 as true, Scott's Blog Post and the social media posts accusing Sado of assault and criminal conduct would be false and would constitute defamation per se. . . . Accordingly, Sado has established a prima facie case of defamation per se."

The court then turned to the issue of the litigation privilege, and concluded that it did not apply, in that there was an insufficient nexus between the allegedly defamatory posts and the litigation Scott eventually filed. Instead, the posts "are statements published publicly on the internet to anyone, months prior to the instant litigation." The motion was therefore denied.[7]

Scott filed a timely notice of appeal.

### DISCUSSION

"We review de novo the grant or denial of an anti-SLAPP motion. [Citation.] We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. [Citations.] In

---

[7]      Sado argued that Scott's motion was frivolous, entitling him to his attorney fees. (Code Civ. Proc., § 425.16, subd. (c)(1).) The court did not find the motion frivolous, and therefore denied Sado's request for attorney fees. On appeal, Sado asks that we remand "for a determination of attorneys' fees to Code Civ. Proc. § 425.16(c)(1)," but makes no argument against the trial court's determination that Scott's motion was not frivolous. We therefore deny Sado's request to remand for attorney fees.

addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. [Citations.] We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law. [Citation.]" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

Preliminarily, the trial court correctly concluded that, barring the application of an absolute privilege, Sado's declaration is sufficient to establish a probability of prevailing. The elements of a defamation claim are: (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1259.) Sado stated the article was false; and, if it was unprivileged, there is no dispute that it was defamatory and had a natural tendency to injure him.

The issue then becomes whether the litigation privilege applies. Civil Code section 47, subdivision (b) states that a privileged publication is one made in any judicial proceeding. " 'The litigation privilege precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding. " 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.] The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' [Citation.]" [Citation.]' [Citation.]" (*Trapp v. Naiman* (2013) 218 Cal.App.4th 113, 121.)

10

While this formulation does not expressly place any limitations on the people *to whom* a privileged litigation (or pre-litigation) statement may be made, the law imposes one.[8]  The privilege is not limited to publications made to parties to the action, but has been expanded to include publications made to nonparties with a substantial interest in the proceeding. (*GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 152 (*GetFugu*).)  The theory is that individuals who possess a substantial interest in the pending litigation can be considered participants.  (*Id.* at p. 153.)  "Notwithstanding the expansion of the scope of the litigation privilege to extend to publication to nonparties with a substantial interest in the proceeding, 'the expansion does not encompass publication to the general public through the press.  Such an expansion would swallow up the general rule, which our Supreme Court . . . reaffirmed, that [the litigation privilege] does not privilege "republications to nonparticipants in the action. . . ." [Citation.]' [Citation.]" (*Ibid.*)

The law is clear and well-established:  the litigation privilege does not apply to communications to the general public. (*Dickinson v. Cosby, supra,* 17 Cal.App.5th at p. 681, fn. 11 [the litigation privilege does not extend to press releases], *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 783-784 [communications to the general public through the press are not protected by the litigation privilege]; *Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1299 [privilege "does not apply to publications to the general public through the press"]

---

[8]     As we discuss, the limitation can be understood as arising out of the requirements that the communication must be made to achieve the objects of the litigation and that it must have some connection or logical relation to the action.

(*Abuemeira*); *GetFugu, supra,* 220 Cal.App.4th at pp. 153-154 [dissemination of statements to the general public is not protected]; *E.D.C. Techs., Inc. v. Seildel* (N.D. Cal. 2016) 225 F.Supp.3d 1058, 1067-1068 [privilege "stops short of protecting statements made to the general public"].)

The reason for this rule is explained in *Abuemeira, supra,* 246 Cal.App.4th at page 1299:  "The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of litigation reprisal.  [Citation.]  Republications to nonparticipants in the action are not privileged and are actionable unless privileged on some other basis.  [Citation.]  Thus, the litigation privilege does not apply to publications to the general public through the press.  [Citation.]  '[L]itigating in the press' does not serve the purpose of the privilege; it serves no purpose other than to provide immunity to those who would inflict damage upon the judiciary.  [Citations.]"

Scott argues, however, that the above-cited cases do not exclude statements to the public from the privilege, but merely establish a limited exception to the privilege for press releases and statements at press conferences.  This misapprehends the factual scenarios addressed in the caselaw, as well as the rationale for the rule.  As to the first, direct statements to the public, not merely public statements through the press, are barred from the scope of the privilege.  (See *GetFugu, supra,* 220 Cal.App.4th at pp. 146, 153-154 [holding that not only was a press release outside the scope of the privilege, a tweet the defendant directly made on the internet was outside its scope as well].)  As to the second, the reason press releases are unprotected is not because they are statements made to the press, but because the press acts as an intermediary for the

public. The harm is in the ultimate publication to individuals without a substantial interest in the litigation. (*Abuemeira, supra,* 246 Cal.App.4th at p. 1299 [the focus is on the nonparticipant "recipients" of the speech; statements "to the general public through the Internet and the media are not protected"].)

Here, Scott posted her article in Medium to reach a wide audience in the general public. One of her conceded reasons for writing it was for people "to know" about Sado. Indeed, she wrote in the article, in bold type, that Sado attacked her "**and I want everyone to know**." Scott now asserts that one of the purposes of her article was to find additional witnesses for her anticipated civil case, who would have a substantial interest in the proceeding and qualify as participants. While this is factually disputable, as the article itself made no reference to that purpose, it makes no difference even if it were true. Obtaining witnesses was not Scott's only purpose and the article was in no way limited to an audience of potential witnesses.[9] It cannot be disputed that another of her purposes was to tell the widest possible audience what she believed Sado had done to her, in order to protect women from Sado and other men like him. If her allegations are true, her goal was laudable. But her publication to the world was not protected by the litigation privilege.

---

[9] We note that in the *GetFugu* case, the challenged press release ended with the lines, "Investigate leads may be sent to [email address]. All tips will be held in the strictest of confidence." (*GetFugu, supra,* 220 Cal.App.4th at p. 146.) The court nonetheless held the press release was unprivileged because it was "posted on the Internet and thus released worldwide." (*Id.* at pp. 153-154.)

### *DISPOSITION*

The denial of Scott's anti-SLAPP motion is affirmed.  Scott shall pay Sado's costs on appeal.


RUBIN, P. J.

I CONCUR:



MOOR, J.

Zelia Scott v. Paul Sado
B313037


BAKER, J., Concurring


I agree the trial court's order should be affirmed based on how counsel for Zelia Scott (Scott) has framed the issues to be decided on appeal. Specifically, counsel for Scott argues only that his client's Medium post is protected by the litigation privilege and does not separately contend Paul Sado's (Sado's) defamation claim against Scott lacks minimal merit. There is accordingly no occasion to decide now whether Sado is a limited public figure for purposes of this dispute (see generally *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577) or whether the available evidence (including Sado's "I'm sorry" admission in response to Scott's text message informing him that "[t]hings haven't been quite right since the night you choked me out") undercuts Sado's claim that Scott falsely accused him of strangling her. Instead, we are called to resolve only the litigation privilege question, and as to that, I agree the majority correctly concludes the privilege has no application here.


                    BAKER, J.